## HORN v. STATE.

HOMICIDE — APPEAL AND ERROR — REVIEW OF EVIDENCE — INSTRUCTIONS—CONFESSIONS—EVIDENCE, CROSS-EXAMINATION—REBUTTAL—CIRCUMSTANTIAL EVIDENCE—OFFER TO PROVE MOTIVE IN OTHERS—EVIDENCE OF OTHER CRIMES—RES GESTÆ—CONTRADICTION OF A WITNESS—OPINIONS OF WITNESS—MISCONDUCT OF COUNSEL—JURY, IRREGULARITIES IN PROCEEDINGS OF.

1. Assigning as error the overruling of the motion for new trial brings up for review each matter that was properly presented to the court below by such motion not abandoned or waived by failure of the brief to refer to them.

2. Where it is claimed that the evidence is insufficient to sustain the verdict of conviction in a criminal case, the question is not whether the evidence convinces the appellate court beyond a reasonable doubt of the guilt of the accused, but whether, if believed by the jury, the facts are sufficient to have reasonably justified the verdict.

3. The evidence relied upon to convict the defendant of murder consisted of an alleged confession and circumstantial evidence; the defendant explained the confession as having been made jokingly, and it was also contended in his behalf that he was intoxicated and foolishly boasting when he made the alleged confession, and that the circumstances of the murder conflicted with the confession, thereby tending to show that it was not made seriously or with knowledge of the facts; *Held,* upon a review of the evidence, that it was sufficient to sustain the verdict of murder in the first degree.

4. Although the impeachment of one of the witnesses to certain alleged inculpating statements of the defendant, and other testimony in defense to show the improbability that such statements were made, tended to cast a doubt upon that part of the evidence for the prosecution, it was for the jury to determine whether the statements were made or not, and the unsatisfactory character of the evidence as to such statements would not justify a reversal, since, if disregarded, the other evidence is sufficient to sustain the verdict.

5. Though as a general rule verbal admissions are to be received with great caution, it was proper to refuse an instruction that a prisoner's confessions out of court are a doubtful species of evidence and should be acted on with great caution, the defendant having admitted the inculpatory statements attributed to him when he was not under arrest, nor publicly accused of the crime, but explained that they were made jokingly, and in his behalf it was claimed that he was indulging in foolish talk while intoxicated, and the jury were instructed that to entitle defendant's admissions to any weight they must be shown to be genuine admissions of guilt, and it was for them to determine whether the admissions were sincere statements of defendant, and what weight should be given to the confession.

6. For the purpose of showing motive and ability in other persons to commit the murder for which the accused was on trial, it was improper, on cross-examination of a witness, for the state to question him respecting previous difficulties between him and the deceased, and the father of the deceased and his neighbors, nothing of the kind having been brought out on direct examination.

7. To be admissible, evidence must tend to prove the issue; it is not necessary that every fact should bear directly upon the issue, but it becomes admissible if it tends to prove the issue, or constitutes a link in the chain of proof.

8. The rule that evidence must tend to prove the issue excludes all evidence of collateral facts which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute, and the tendency of which is to divert the mind from the point in issue, and to excite prejudice and mislead or confuse the jury.

9. The evidence to convict the accused of murder consisting of an alleged confession, together with circumstantial evidence, and the defendant denying that the confession was made seriously, but insisting that it was made jokingly, it was competent for him to show by evidence, reasonably tending to show that fact, that the crime was committed by another.

10. Where the only effect of testimony offered by the defendant on trial for murder would have been to generate a mere suspicion that, solely because of ill will or hatred against the family of which deceased was a member, and the utterance of threats of taking life, some other person might have committed the crime, it was properly excluded.

11. Evidence offered to show a possible motive on the part of some unnamed person or persons in the community to injure some member of the family of which deceased was a member, and perhaps to take the life of some member of that family, without showing or offering to show some overt act on the part of such person or persons toward the commission of the crime charged against the prisoner, or an opportunity on his or their part to have perpetrated the crime, is not admissible, since it would not reasonably tend to establish defendant's innocence.

12. An offer by the defendant on trial for the murder of a boy fourteen years old to show that there were feuds between the family of deceased and two or three immediate neighbors, without naming them, and to show the character of the feuds, and that there had been threats of killing on both sides, and that the father of deceased and a certain neighbor had both been bound over to keep the peace toward each other, and the general situation in the community (a sparsely settled neighborhood in the country), held to have been properly excluded.

13. The physician who had conducted the post mortem examination of the body of the deceased, while being examined as a witness for the state, having expressed a positive opinion regarding the probable calibre of the projectile that produced. the death wound, to the surprise of the prosecutor, who relied upon his statements at the preliminary examination, it was competent for the prosecution, under the statute (R. S., Sec. 3685), to question him as to his former testimony to the effect that it was impossible, from his examination of the body, to determine the size of the bullet, to lay the foundation for contradicting him.

14. It was not error to admit in evidence a cartridge such as might be used in the rifle with which defendant admitted in his confession he had shot the deceased, which was found some two weeks after the homicide, and about two miles from the scene thereof, on a public highway over which, according to the theory of the prosecution, · the defendant traveled in his flight after committing the crime; since the country was sparsely settled, the road but little traveled, and under such circumstances it is difficult to define a boundary to the vicinity or neighborhood of the crime, and some discretion in that respect must be accorded the trial judge.

15. The fact that other persons in the community had the same kind of rifle, and might have kept the same kind of cartridges, would lessen the strength of the evidence of the found cartridge, but would not render it inadmissible.

16. *Held*, that the admission of certain letters tending to explain the circumstances under which the confession was made was not prejudicial.

17. It having appeared in the evidence that the father of the deceased, shortly after the murder, had been shot or shot at, and the defendant's confession having admitted shooting at the father five times, for which he claimed in the confession to have received compensation in money from other parties, and the shooting at the father tending to show the motive for killing the deceased, but the defendant having explained his confession as statements made jokingly, and having, in his direct examination, denied killing the deceased or any other person, he was asked on cross-examination whether he had not, at other stated times and places, admitted shooting at the father, and he denied having made such statements. The witness to such state-

ments was called to contradict the defendant in his denial thereof. *Held,* that such contradiction was competent and did not violate the rule against contradicting a witness upon collatteral and irrelevant matters brought out on cross-examination.

18. In view of the facts in the case, and the connection of the shooting at the father with defendant's inculpatory admissions, and his explanation of all his damaging statements in the confession as a joke, it was competent for the state, on cross-examination, to question him respecting similar statements at other times, and on his denial thereof to contradict him by the testimony of the person to whom the statements were made.

19. Such testimony affected defendant's credibility, and was relevant upon the important issue as to whether his confession was intended to seriously and truthfully connect himself with the homicide.

20. The testimony being material for certain purposes, it would not be rendered inadmissible because it might also connect the defendant with another crime.

21. Proof of the participation of the accused in other crimes of a similar nature is only competent when it bears directly upon the question of guilt of the crime for which the accused is being tried. If it has a reasonable tendency to establish the guilt of the prisoner of the crime charged, other than by merely showing a capacity or disposition to commit such crimes, or that, having committed one crime, it is probable he might be guilty of the one charged, it may be admissible.

22. Owing to the peculiar facts in this case, it would have been competent for the state to have shown that the defendant was the person who had shot or shot at the father of the deceased, since such proof would have tended to establish both the identity of the defendant as the party guilty of the crime charged, and his motive in its commission.

23. The fact that certain evidence may have been in part admissible in chief does not render it necessarily incompetent in rebuttal.

24. Where an alleged confession of an accused is claimed by him to have been made jokingly or boastingly, and not seriously, witnesses to the confession may state what his man-

ner was in making the confession, and whether he appeared to be sincere in his statements or otherwise.

25. The fact that a witness to the confession heard it from behind a closed door leading into an adjoining room, where he had purposely located himself to listen to the statements of the accused, and did not see his countenance at the time, may influence the weight to be given his opinion regarding the manner of the accused in making the confession, but does not render it inadmissible.

26. The effect of the statement by witnesses to a confession of an accused that his manner when making the confession was "sincere," is that the accused acted and appeared as though he meant what he said.

27. Where conviction is sought upon circumstantial evidence, the prosecution is not required to establish beyond a reasonable doubt every circumstance offered in evidence which tends to establish the ultimate circumstances or facts on which it relies for a conviction; it is only necessary that every essential fact or every individual circumstance necessarily entering into the proofs should be so established.

28. As a part of an instruction in a murder case depending on circumstantial evidence, which stated the material allegations of the information, and that they must all be established by the prosecution beyond a reasonable doubt, and that all the facts and circumstances taken together should establish defendant's guilt beyond a reasonable doubt, to warrant his conviction, the following language was not error: "It is not necessary that other facts or circumstances surrounding such testimony as has been given on behalf of the state should be established beyond a reasonable doubt. Some of such facts or circumstances may be established by a preponderance of evidence, or may not be established. It is not meant that it is incumbent upon the prosecution to establish every fact surrounding such testimony, as given, beyond a reasonable doubt."

29. It was not error to refuse an instruction at defendant's request that to convict upon circumstantial evidence the facts and circumstances must be such as are absolutely incompatible upon any reasonable hypothesis with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than the guilt of the accused, where other instructions were given at defendant's request

fairly stating the law as to circumstantial evidence; and the use of the words, "absolutely incompatible with the innocence of the accused," had been condemned in a former case. (Cornish v. Territory, 3 Wyo., 96.)

30. Misconduct of counsel in making improper remarks in his argument to the jury are not, as a rule, ground for reversal, unless proper objection thereto was made at the time of the alleged misconduct.

31. *Held,* on review of the evidence respecting alleged irregularities in the proceedings of the jury through alleged misconduct of third parties in the presence of, and undue influence and pressure upon, the jury, that the showing was insufficient to impeach the verdict.

[Decided September 30, 1903.]                    (73 Pac., 705.)

ERROR to the District Court, Laramie County, HON. RICHARD H. SCOTT, Judge.

Tom Horn was convicted of murder in the first degree and sentenced to death for the killing of one Willie Nickell. He prosecuted error. The facts are stated in the opinion.

*John W. Lacey, Burke & Clark, and Matson & Kennedy,* for plaintiff in error.

The only evidence rightly admitted, that tends in any way to establish the guilt of plaintiff in error of the crime charged, is the so-called confession. At the time of the alleged confession the plaintiff in error, while not staggering drunk and maudlin, was under the influence of liquor and unusually talkative, which was his condition when under such influence. Horn himself says that the confession was all a "josh;" that it was a contest in telling tall yarns. The theory advanced by Horn in the alleged confession was impossible and does not fit the facts. The character of the conversation, the absurdity of the statements when taken with the undoubted facts and circumstances surrounding the killing, shows them to have been made in joke and not seriously. Under no other condition than that the

public mind was forced into a blaze of indignation, and was demanding a victim, would the tale told by Horn to Lafors been accepted as sufficient upon which to base a verdict of guilty.

The statements made in that conversation were not corroborated by the testimony concerning Horn's alleged statements in Denver, for there never was testimony so absolutely shown to have been perjured than that of the three witnesses to the alleged Denver statements.

The surgeons generally agreed that it was impossible for the wounds on the body of the deceased to have been caused by a thirty-caliber ball, and yet that is the caliber that was used in the gun with which Horn told Lafors the shooting was done; showing that Horn was not attempting to relate facts in his conversation with Lafors concerning the killing of the deceased. From where Horn said he was standing when the killing occurred, as he related it, it was impossible for the deceased to have been shot in the manner disclosed by the post mortem examination. Interpreting the confession, so-called, as a seriously intended confession renders it in conflict with all the other evidence, while interpreting it as a "josh," it is in harmony with all the rest of the testimony.

There is not enough evidence in the case to sustain the verdict, and in such case the verdict will be set aside. (Ketchum v. Davis, 3 Wyo., 164; Rainsford v. Massengale, 5 id., 9; Hood v. Smiley, id., 70; Hester v. Smith, id., 291; Jackson v. Mull, 6 id., 55; Bryant v. State, 7 id., 311.) Where the verdict of the jury is manifestly against the evidence, and the trial judge refuses to set the verdict aside, it is the duty of the appellate court to reverse the case and grant a new trial. (Helfrich v. Ry. Co. (Utah), 26 Pac., 295; Keaggy v. Hite, 12 Ill., 100; Brown v. Comm. (Ky.), 69 S. W., 1098; State v. Debolt (Kan.), 37 Pac., 992; Falk v. People; 42 Ill., 331; Dains v. State, 2 Humph., 442; People v. San Martin, 2 Cal., 485; People v. Acosta, 10 Cal., 196; People v. Ah Lay, id., 301; Peo-

ple v. Lewis, 36 Cal., 351; Randall v. People, 63 Ill., 202; State v. Wise (Ia.), 50 N. W., 59; State v. Pilkington (Ia.), 60 N. W., 502; Roberts v. State (Ga.), 40 S. E., 697; State v. Prendible (Mo.), 65 S. W., 559; Fann v. State (Ga.), 37 S. E., 378; Shay v. State, id., 884; Andrews v. State, 42 id., 476; Barnell v. State, 5 Tex. App., 113; Brown v. State, 32 Tex., 606; Turner v. State, 38 id., 166; Aycock v. State, 2 Tex. App., 381; Block v. State, 20 id., 175; Butts v. State, 52 Ind., 331; Long v. State, 56 Ind., 117; State v. Bird, 1 Mo., 585; State v. Packwood, 26 Mo., 340.)

The court erred in refusing to give the instruction that the confessions of a prisoner out of court are a doubtful species of evidence and should be acted on by the jury with great caution. (Hay v. Peterson, 6 Wyo., 432; Gay v. State, 2 Tex. App., 127; Walker v. State, id., 326; Cain v. State, 18 Tex., 387; Comm. v. Sanborn, 116 Mass., 61; People v. McArron, 79 N. W., 944; Marion v. State (Neb.), 20 N. W., 294; People v. McMahon, 15 N. Y., 384; State v. Gilcrease, 26 La. Ann., 622; Metzger v. State, 18 Fla., 481; State v. Fields, 7 Tenn., 140; McCabe v. Comm. (Pa.), 8 Atl., 45; U. S. v. Coons, 25 Fed. Cas., No. 14860; Haynes v. State, 27 So., 601; Greenleaf's Ev., Sec. 200; Harris' Crim. Law, 373; May's Crim. Law, 104; State v. Summons, 1 Ohio Dec., 416.)

The defendant sought to prove that there were other persons who had motive and opportunity to commit the crime charged against the defendant. The defendant was a stranger to the boy that was killed. Others in the neighborhood had not only a close acquaintance with him, but a bitter animosity against him, and it was sought to show this animosity, the threat to kill on both sides, as well as the opportunity with such motives of such persons to do the killing. Where the state depends on circumstantial evidence for conviction any testimony tending to show that some other person committed the crime is admissible. (Ogden v. State (Tex.), 58 S. W., 1018; People v. Mitch-

ell, 34 Pac., 698; People v. Myers, 12 Pac., 719; Dubose v. State, 10 Tex. App., 230; Sidney v. Comm., 1 Ky. L. Rep., 120.)   The testimony of the witness Barber on the former hearing, the witness himself being present at the trial, was not competent.   Had he been a witness for the defense, and cross-examination had shown his testimony to differ from his former evidence, then such other testimony would have been competent in cross-examination, but to permit it to be so given in chief is permitting hearsay testimony and the cross-examination of one's own witness.

The finding of the cartridge permitted to be introduced in evidence had no tendency to connect the defendant with the crime, and the same should have been excluded.   In a case of this kind, where the community have been excited over the crime, the merest trifles are liable to seem strong proof, and it was the duty of the court to prevent prejudice against the prisoner by excluding proof entirely without legal force.   Under the circumstances of the finding the cartridge two weeks after the crime, on a public highway some distance from the scene of the murder, and the fact that many persons in the community had guns requiring such a cartridge, the finding of the particular cartridge in question had no possible relevancy or weight.   Whenever the evidence of circumstances leaves it indifferent which of several hypotheses is true, it can never amount to proof, however great the probability in relation to one of them may be; and it can, therefore, scarcely fail to be the occasion of injustice if it is not in practice entirely disregarded. (Comm. v. Farrar, 10 Gray, 6; 1 Starkey Ev., 506; People v. Kennedy, 32 N. Y., 141; State v. Thomas (Mo.), 12 S. W., 643.)

The matters contained in the letters concerned in the conversation between Horn and Lafors have no relation to the crime here charged, and served only to create a prejudice against the prisoner.   They should have been excluded.

It is always inadmissible to blacken the character of the defendant in any other way than proof of the direct crime

and defendant's connection therewith. The rule. excludes all general evidence of defendant's moral character, all reprehensible conduct of the defendant other than that involved in his participation in the crime on trial. And any proof of the participation of defendant in any other crime is clearly inadmissible. (Jordan v. Osgood, 109 Mass., 457; People v. Schweitzer, 23 Mich., 301; State v. Gottfreedson (Wash.), 64 Pac., 523; Raines v. State (Miss.), 33 So., 19; State v. Kirby (Kan.), 63 Pac., 752; People v. Williams, 59 Pac., 581; Hoberg v. State, 3 Minn., 262; State v. Crouse, 86 N. C., 617; Comm. v. Buzzell, 33 Mass., 156; Comm. v. Farrar, 76 id., 6; State v. Zimmerman, 42 Pac., 828; McAuley v. Harris, 9 S. W., 679; Platner v. Platner, 78 N. Y., 90; State v. Davis, 87 N. C., 514; Hildeburn v. Curran, .65 Pa. St., 59; Gallaher v. State, 17 Fla., 370; Clark v. Clark, 65 N. C., 655; People v. Ascher (Mich.), 86 N. W., 140; Allen v. U. S., 115 Fed., 3; People v. Quick, 25 N. W., 302; Drake v. Comm., 10 Mon., 225; State v. Staley, 14 Minn., 75; 3 Rice Cr. Ev., 419; Derby v. Gallup, 5 Minn., 85; Hicks v. Stone, 13 id., 398; 1 Greenleaf's Ev., Sec. 462; Harris' Cr. Law, 368; Wharton Cr. Ev., Sec. 484; People v. Lee Dick Lung, 62 Pac., 71; People v. Dye (Cal.), 16 Pac., 537.) Nor can it be contended that because the defendant on the witness stand attempted to state certain conversations with the witness Lafors, it became permissible for the prosecution, not only to deny the conversations as stated by the defendant, but to go further and state, not only the version of Lafors of what was said in reference to the matters testified about by the defendant, but what was said about a separate and distinct crime, though said in the same conversation. (Rouse v. Whited, 25 N. Y., 170; Prince v. Sano, 7 A. & E., 627; State v. Staley, 14 Minn., 105; McAuley v. Harris (Tex.), 9 S. W., 679; Platner v. Platner, 78 N. Y., 90; Garey v. Nicholson, 24 Wend., 350; Dorlon v. Douglas, 6 Barb., 451; The Queen's Case, 2 B. & B., 297; Sturge v. Buchanan, 10 A. & E., 598.) The prosecution could not, by going outside of proper cross-examination, lay the foun-

dation to contradict the defendant when testifying as a witness.

The court erred in permitting the witnesses to the alleged confession to state their opinions as to whether the manner of defendant in making the confession was sincere. (Hodge v. State, 7 So., 593; Poe v. State, 6 id., 378; Lewis v. State, 11 id., 259; McAdory v. State, 59 Ala., 92; Johnson v. State, 17 Ala., 618; Lawrence v. Thompson, 49 N. Y. Sup., 839; Van Wycklen v. City, 118 N. Y., 424; McCarragher v. Rogers, 120 N. Y., 526; State v. Kilburn, 52 Pac., 277; State v. Houston, 78 Ala., 576; State v. Garvey, 11 Minn., 95; Gilman v. Riopelle, 18 Mich., 144; State v. Rhoades, 29 O. St., 171; Ex. Co. v. Anthony, 5 Kan., 498.)

The vice in the instruction that it is not necessary for the state to prove surrounding facts and circumstances outside the material facts beyond a reasonable doubt is that it covered up from the jury the method of arriving at a conclusion. All that it states concerning evidentiary facts is not only that they need not be established beyond a reasonable doubt, but that it is not necessary that they should be established by even a preponderance of evidence, and need not be established at all. Yet the jury may consider them, and if so considering them, it produces a conviction of guilt, they are authorized to so find. Such instructions have been frequently condemned. (Graves v. People, 32 Pac., 65; People v. French, 10 Pac., 378; Leonard v. Ter., 7 Pac., 872; Marion v. State, 20 N. W., 289; State v. Glein, 41 Pac., 998; Ter. v. McAndrews, 3 Mont., 158.)

The instruction refused on the subject of circumstantial evidence, viz: that the state must not only show, by preponderance of evidence, that the alleged facts and circumstances are true, but they must be such facts and circumstances as are absolutely incompatible upon any reasonable hypothesis with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the accused, was a clear statement of the law as applicable to the case. (Ter. v. Lermo, 46

Pac., 16; People v. Phipps, 39 Cal., 326; People v. Brittain, 50 Pac., 664; People v. Gosset, 29 Pac., 246; State v. Asbell, 46 Pac., 770; State v. Hunter, 32 Pac., 37; State v. Andrews, 61 Pac., 808; Horne v. State 1 Kan., 47.)

The improper remarks of the Prosecuting Attorney, in his closing argument, was greatly prejudicial to the defendant, and should cause a reversal of the judgment. We do not conceive how any possible instruction of the court could have cured the error, or wiped away the effects of the misconduct. It will be claimed that the defendant should have taken advantage of the misconduct at the time, and excepted openly. Some of the authorities show the futility of such objections. The tendency in this case of such an objection would have been to strengthen the force of the misconduct. If it be true that this was error prejudicial to the defendant, it could not have been cured by instructions of the court. And the law does not demand that a vain thing be done. This misconduct shows in itself that the accused did not have a fair and impartial trial. (Rolfe v. Rumford, 66 Me., 566; People v. Ah Len, 92 Cal., 282; Jordan v. Wallace, 67 N. H., 175; Mason v. Knox, 66 id., 545; Berry v. State, 10 Ga., 511; Smith v. State, 68 S. W., 995; Greenfield v. Kennett, 45 Atl., 233; Newton v. State, 21 Fla., 53; Quinn v. State, 15 N. E., 46; People v. Evans, 40 N. W., 473; State v. Shelton, 49 Pac., 702; State v. Fischer, 124 Mo., 460; Augusta v. Randall, 11 S. E., 706; State v. Kring, 64 Mo., 591; Tucker v. Henniker, 41 N. H., 317; State v. Bokien, 44 Pac., 889; McDonald v. People, 18 N. E., 817; People v. Quick, 25 N. W., 302; Bradburn v. U. S., 64 S. W., 550; People v. Kramer, 117 Cal., 647; Ivey v. State, 39 S. E., 423; Boone v. People, 36 N. E., 99; Florence v. Field, 16 So., 538; Anderson v. State, 16 So., 108; Bennett v. State, 12 S. E., 806; Griffin v. State, 90 Ala., 596-600; Willis v. McNeill, 17 Tex., 465; People v. Mitchell, 62 Cal., 411; State v. Folly, 12 Mo. App., 431; Choen v. State, 85 Ind., 209; Von Pollnitz v. State, 92 Ga., 16;

Vaughan v. State, 58 Ark., 353; Rudolph v. Landwerlen, 92 Ind., 34-40; People v. Conley, 106 Mich., 424; Earll v. People, 99 Ill., 123; Ross v. State, 8 Wyo., 351-372; People v. Valliere, 59 Pac., 295; Newby v. People, 62 Pac., 1035; State v. Baker, 46 Pac., 947; State v. Gutekunst, 24 Kan., 252; State v. Biggerstaff, 43 Pac., 709; Herren v. State, 62 Pac., 833; Sullivan v. Ry. Co. (Ia.), 93 N. W., 367; Falk v. People, 42 Ill., 331-334; People v. Derbert (Cal.), 71 Pac., 564; State v. Irwin (Idaho), 71 Pac., 608.)

It appears from the affidavits in support of the grounds for new trial that there was irregularity in the proceedings of the jury that juror Payne and other jurors heard remarks by outsiders that led them to feel that there was an impression among the people that they had been bribed by the defendant, and that such a view would prevail in case of a disagreement. It is the theory of the law that the jury shall be kept entirely free from outside pressure and opinion. They have no right to receive impressions from other sources than the evidence in the case. If it be proved or presumed as a conclusion of law that the verdict may have been influenced from outside sources the verdict is subject to be set aside. Enough was shown here to require the vacation of the verdict on such account. (People v. McCoy, 71 Cal., 395; People v. Turner, 39 Cal., 370; State v. Morris, 84 N. C., 756; State v. Harrigan (Del.), 31 Atl., 1052; People v. Stokes, 103 Cal., 193; People v. Mitchell, 34 Pac., 698; Thompson v. State, 26 Ark., 323; State v. Brittain, 89 N. C., 481; Howland v. Reeves, 25 Mo. App., 458; Clapp v. State, 94 Tenn., 186.) The affidavit of the juror was admissible for the purpose of showing the outside remarks and influence. (Wright v. The Ill. Co., 20 Ia., 195; Perry v. Bailey, 12 Kan., 539; Farrer v. State, 2 O. St., 54; State v. Clark, 8 Pac., 528.)

Many of the errors in this case are of cumulative power. The force of one error is enhanced by reason of others. The misconduct of counsel was one way by which the jury

were reached in addition to the impression created by outside remarks, and gave the latter accumulated force. The same is true of the finding of the cartridge, and the error in admitting the opinions of witnesses as to the sincerity of the prisoner in his talk with Lafors. Grievous errors occurred, which prevented defendant from having an impartial trial.

*J. A. Van Orsdel,* Attorney General, and *W. R. Stoll,* County and Prosecuting Attorney, for the State.

There is not a single fact surrounding the killing which is not corroborated by the defendant's statement to Lafors of the circumstances of the killing. The defendant enumerated the particulars in his confession with such minuteness as could only have been done by an eye witness to the killing, and with a knowledge as to the facts and motive for the crime that could have been had by the one knowing the facts. He was perfectly rational at the time of the confession, although he had probably been drinking the evening before, but he was not so much under the influence of liquor that he was observed to be drunk by those who saw him closely connected with the time of the confession.

There is an abundance of evidence to justify the verdict without either the Denver admissions or the confession. The only evidence that the narration of the facts in the confession was a joke is the defendant's own statement to that effect when testifying as a witness. We assume it to be within common knowledge that when one person "joshes" with another, the subject spoken about and the manner of speaking both convey to the person addressed the idea of a "josh." It would be as apparent to one as the other. The defendant admitted that everything was sincere in the conversation up to the point of talking about the killing of the deceased. It is strange that he was sincere in everything else, and joking as to this particular matter. The defendant's own testimony clearly estab-

lishes the absence of a joke in his confession. We do not agree that the Denver admissions were disproved. It is possible that they occurred at such a time as the defendant was able to talk; and the witnesses may have been mistaken merely as to the time.

The requested instruction as to the confessions of the prisoner being received with great caution was not applicable to the case, and it but partially stated the law. The defendant was not in fear, nor was he under arrest; and there is no dispute about what was said by him. The court believed it improper to instruct as to what weight should be given to the evidence on any branch of the case. The jury were correctly instructed regarding the law of confessions in other instructions. Every confession is not to be received with great caution. Sometimes a confession is entitled to the greatest weight. If an instruction does not embrace the whole law of the case, so far as the same is involved in the instruction, it is not error to refuse it. To justify the admission of confessions, they must be probably true. (Whart. Cr. Ev., Secs. 658, 623.) It is for the court in the first instance to determine the admissibility of confessions; and the question, of course, whether they were voluntary or not can arise only when threats or promises were made, or under such circumstances as to imply them. That question does not arise here. (6 Ency. Law (2d Ed.), 554; Whart. Cr. Ev., Sec. 689.) By the great weight of authority an instruction that a confession should be received with great caution, or that it is entitled to great weight, is erroneous. It is not proper to instruct as to the weight to be given a confession as either weak or to be entitled to but little consideration. If the confession be received, then its weight is a question for the jury. (2 Thomp. Tr., Sec. 2431; 6 Ency. L. (2d Ed.), 579, 580; Thurston v. State, 18 Tex. App., 26; Collins v. State, 20 id., 399; White v. Ter. (Wash.), 19 Pac., 37; Mauro v. Platt, 62 Ill., 450; Frizell v. Cole, 29 Ill., 465; Knowles v. Dixon (Mont.), 43 Pac., 628; State v. Gleim, 41 id.,

998; Wastl v. Ry. Co., 42 id., 772; Kaufman v. Maier (Cal.), 29 id., 481; Johnson v. Stone (Miss.), 13 So., 858; Bobo v. State, 16 id., 755; Shinn v. Tucker, 37 Ark., 580; Castleman v. Sherry, 42 Tex., 59; Blackburn v. Comm., 75 Ky., 181; State v. Bell, 70 Mo., 733; State v. Staley, 14 Minn., 75; Garfield v. State, 74 Ind., 60; Davis v. Hardy, 76 Ind., 272; Finch v. Bergins, 89 Ind., 360; Koerner v. State, 98 Ind., 7; Lewis v. Christie, 99 Ind., 377; Shorb v. Kinzie, 100 Ind., 429; Unruh v. State, 105 Ind., 117; Morris v. State, 1 N. E., 70; Zenor v. Johnson, 7 id., 751; Tobin v. Young, 24 id., 121; Comm. v. Galligan, 113 Mass., 202; Flick's Case, 97 Va., 766; McKinney v. State, 32 So., 726; Burton v. State, 18 So., 284.)

No offer was made by the defense to prove that any other particular person committed the crime charged. To have made the offer competent, it was necessary to offer to prove that some other person named had killed the deceased. The offer was not sufficient to authorize the evidence proposed. The questions propounded on cross-examination of Victor Miller were improper, since nothing of the kind had been brought out on the direct examination. To be admissible in defense, evidence connecting another party with the crime must be of the same class or of a higher class than that relied upon by the prosecution for defendant's conviction. The testimony of the prosecution was direct evidence, consisting of a confession and circumstances corroborating the same. To connect some other person with the crime would require direct and not circumstantial evidence. Evidence of neighborhood feuds or threats against the deceased are inadmissible. (Whart. Cr. Ev., 245; 2 Best on Ev., 506; 2 Bish. Cr. Proc., 623; State v. Davis, 77 N. C., 483; State v. Duncan, 6 Ired., 236; Walker v. State, 6 Tex. App., 601; 31 La. Ann., 368; Comm. v. Abbott, 130 Mass., 472; State v. Bishop, 73 N. C., 44; State v. White, 68 id., 158; State v. Haynes, 71 id., 79; State v. May, 4 Dev., 328; Crookham v. State, 5 W. Va., 510; Schoolcraft v. State, 117

Ill., 277; Carlton v. People, 150 id., 183; State v. Smith, 35 Kan., 618; State v. Crawford, 99 Mo., 74; State v. Taylor, 136 Mo., 66; Thomas v. People, 67 N. Y., 218; Daniel v. State, 65 Ga., 199; Henry v. State, 30 S. W., 802; Matherly v. Comm., 19 id., 977; Josephine v. State, 39 Miss., 613.) It is not sufficient to prove that another might have committed the crime. (State v. Beck, 73 Ia., 616; Tatum v. State, 31 So., 369; Baker v. State, 126 Ala., 1; Owensly v. State, 82 id., 64; Means v. State, 10 Tex. App., 22; Holt v. State, 9 id., 582; Alston v. State, 63 Ala., 178.) Admissions of a third party that he is guilty, and not the accused, are excluded. (3 Rice on Ev., Sec. 87; West v. State, 76 Ala., 98; Peck v. State, 86 Tenn., 268.) On this branch of the case the following cases sustain the prosecution: State v. Young (La.), 31 So., 993; Hodge v. State, 64 id., 242; State v. West, 12 id., 8; Sharp v. State, 6 Tex. App., 650; Comm. v. Chabbock, 1 Mass., 143; Sible v. State, 9 Ala.; 3 Heisk., 138; Smith v. State, 9 Ala., 990; Rhea v. State, 10 Yerg., 258; Greenfield v. People, 85 N. Y., 75; Kelly v. State, 9 S. E., 171; Moughon v. State, 57 Ga., 102; Snow v. State, 58 Ala., 372; U. S. v. Mulholland, 50 Fed., 417.

At common law a party being surprised by the testimony of a hostile witness might call his attention to other contradictory statements, that he might explain them. But the statute permits a party to contradict such a witness, and call other witnesses, or produce other evidence, showing that the witness has made different statements at other times inconsistent with his testimony. Such evidence can be used only to impeach the witness. The conditions of the statute were complied with in the questions propounded to the witness Dr. Barber. (R. S., Sec. 3685; Adams v. Wheeler, 97 Mass., 67; Ryerson v. Abington, 102 Mass., 526; Day v. Cooley, 118 id., 524; Brooks v. Weeks, 121 id., 433; Comm. v. Donahue, 133 id., 407; Underhill Cr. Ev., Secs. 235, 238.)

The place where the cartridge introduced in evidence was found was not out of the immediate vicinity of the

crime, considering the sparsely settled condition of the neighborhood. In connection with the other evidence, the finding of the cartridge tended to support the theory of the prosecution, and the evidence was admissible. (State v. Gray (Ia.), 89 N. W., 987; State v. Weems, 96 Ia., 441; State v. Ward, 61 Vt., 182; State v. Costello (Wash.), 69 Pac., 1099; Stevenson v. Stewart, 11 Pa. St., 308; Gustavenson v. State (Wyo.), 68 Pac., 1006.)

·The letters objected to were admitted on the ground that they led up to the conversation of defendant with Lafors and explained the circumstances under which the confession was made. All circumstances leading up to the confession and surrounding it were relevant and material as bearing on the credit to be given to it. (Gillet Ind. & Col. Ev., Sec. 120.) The same kind of testimony having been admitted without objection, the objection to the particular letters in question was waived. (Payne v. Miller, 14 S. E., 926; Butler v. R. Co., 54 N. W., 208; R. Co. v. Morrison, 32 Pac., 859; Bank v. Inman, 34 N. E., 21; Ry. Co. v. John, 29 S. W., 558; R. Co. v. Garteiser, id., 939; R. Co. v. Huffman, 32 id., 30; 8 Ency. Pl. & Pr., 211-252; 2 Rice Ev., 918-945.)

There was no attempt on part of the prosecution to establish the commission of other crimes by the defendant. Proof of other substantive offenses is admissible where such offenses tend to prove intent in the crime charged, to exclude the idea of accident or mistake, to show a common scheme or plan, and to identify the defendant. Such proof in general is admissible when it is relevant in establishing the crime charged. (Whart. Cr. Ev., Sec. 48; 1 Bish. New Cr. Proc., Sec. 1120 *et seq.;* Underhill's Ev., Sec. 58; Abb. Tr. Br., Cr. Tr., Sec. 598; People v. Mollineux, 168 N. Y., 264.) The cross-examination of the defendant as to his statements at other times than on the occasion of the confession with reference to the shooting of the father of deceased was proper, in view of the character of the explanation of the confession, the testimony of the defendant

in denial of the serious nature of the confession, and his denial of having killed the deceased or any other man. (Whart. Cr. Ev., Sec. 470; id., 432; Underhill Cr. Ev., 235, 238, 244; 1 Greenleaf Ev., 446-450; State v. Merriam (S. C.), 12 S. E., 619; Greenfield v. People, 13 Hun, 242; State v. Crane, 15 S. E., 231; Davis v. State, 31 S. W., 569; People v. Rushing, 62 Pac., 742; State v. Kent, 5 N. D., 516; People v. Dupounce (Mich.), 94 N. W., 388; People v. Higgins (Mich.), 86 N. W., 812; Cloutier v. Grafton (Mass.), 39 N. E., 110; Wallace v. State (Fla.), 26 So., 713; Com. v. Bean, 111 Mass., 438; State v. Larkins (Idaho), 47 Pac., 945; People v. Piggott (Cal.), 59 Pac., 31; People v. McCarthy (Cal.), 18 Pac., 862; State v. Phelps (S. D.), 59 N. W., 471; People v. Larson (Utah), 37 Pac., 258; Taylor v. Com. (Ky.), 18 S. W., 852; State v. Whitman, 72 Me., 531; Disque v. State (N. J.), 8 A., 281; State v. Broadbent (Mont.), 71 Pac., 1; People v. Tice, 131 N. Y., 651; State v. Armstrong (Wash.), 69 Pac., 392; Guy v. State (Md.), 44 A., 997; Williams v. Com. (Ky.), 52 S. W., 843; Min. Co. v. Min. Co. (Utah.), 63 Pac., 587; Stewart v. State (Fla.), 28 So., 815; Clemens v. Conrad, 19 Mich., 170; Wilbur v. Flood, 16 Mich., 40; People v. Casey, 72 N. Y., 393; Brandon v. People, 42 N. Y., 265; State v. Pfefferle, 36 Kan., 90; State v. Probasco, 46 Kan., 310; State v. Park, 57 Kan., 431; State v. Wells, 54 Kan., 161; State v. Abbott (Kan.), 69 Pac., 160; State v. Greenburg, 59 Kan., 404; Jones v. State (Tex.), 71 S. W., 962; Bearden v. State (Tex.), 73 S. W., 17; State v. Williams (S. C.), 43 S. E., 671; Markgrof v. Klinge, 71 N. Y. S., 590; State v. Ogden (Ore.), 65 Pac., 449; Williams v. Com. (Ky.), 52 S. W., 843; People v. Boemer, 114 Cal., 51; Hyde v. Ty., 8 Okl., 69; State v. Watson, 102 Ia., 651; Ellis v. State, 152 Ind., 326; State v. O'Brien (Ia.), 46 N. W., 861; State v. Pratt (Mo.), 26 S. W., 556; State v. Taylor (Mo.), 24 S. W., 449; Parker v. State (Ind.), 35 N. E., 1105; People v. McCormick, 135 N. Y., 653; People v. Foote, 93 Mich., 38; Burdette v. Com. (Ky.), 18 S. W.,

1011; State v. Thomas (N. C.), 4 S. E., 518; Ty. v. O'Hare (N. D.), 44 N. W., 1003; State v. Merriam (S. C.), 13 S. E., 328; State v. Murphy (La.), 13 So., 229; State v. Alexis (La.), id., 394; Squires v. State (Fla.), 27 So., 864; State v. Ekanger (N. D.), 80 N. W., 482; State v. Rozium (N. D.), id., 477; State v. Lawhorn, 88 N. C., 634; Lee v. State (Tex.), 73 S. W., 407.)

It was competent for the witnesses to the confession to state their opinion as to the manner of the defendant and whether he appeared to be sincere or not. (12 Ency. Law, 490; Lawson Expert Ev., 519; State v. Brown, 28 Ore., 148; Mitchell v. State (Fla.), 31 So., 242; Russell v. State (Neb.), 92 N. W., 751; Rutherford v. Ry. Co., 67 S. W., 161; Reinhaus v. Life Asso. (Ia.), 89 N. W., 1113; Meyers v. State, 37 Tex. Cr., 208; Rogers Ex. Test., Sec. 4; Powers v. State, 23 Tex. App., 63; White v. State, 16 S., 63; Hall v. City of Austin, 73 Minn., 134; Bailey v. City (Ia.), 78 N. W., 831; Yahn v. City, 60 Ia., 432; State v. Crafton, 89 Ia., 118; State v. Shelton, 64 Ia., 333; Kuen v. Upmier, 98 Ia., 399; Higginbotham v. State, 29 S., 410; State v. Baldwin, 36 Kan., 10; Carney v. State, 69 Ala., 17; Jenkins v. State, 82 Ala., 28; Miller v. State, 107 Ala., 56; Raisler v. State, 38 Ala., 703; State v. Buchler, 103 Mo., 206; Catlett v. State, 61 S. W., 485; Brownell v. People, 38 Mich., 136; State v. Edwards, 112 N. C., 901; Miller v. State, 18 Tex. App., 259.)

It is not incumbent on the prosecution to prove every circumstance or fact beyond a reasonable doubt. It is sufficient if all the evidence satisfies the jury beyond a reasonable doubt. The instruction on that point was a correct statement of the law, and was perfectly fair. (Bradshaw v. State, 22 N. W., 361; State v. Myers (Wash.), 40 Pac., 626; State v. Hosack (Ia.), 89 N. W., 1080; Lackey v. State (Ark.), 55 S. W., 213; Weaver v. People, 132 Ill., 536; Carlton v. People, 150 id., 189; Keating v. People, 160 id., 484; Harvey v. People, 125 Ala., 47; Rayburn v. State, 69 Ark., 177; State v. Cohen, 108 Ia., 209;

State v. Hayden, 45 Ia., 11; Smith v. State, 85 N. W., 49; State v. Glass, 5 Ore., 82; State v. Crane, 15 S. E., 231; Bressler v. People, 117 Ill., 422; Faulkner v. Ter., 30 Pac., 905; Mullins v. People, 110 Ill., 43.)

The instruction requested by defendant on the subject of circumstantial evidence, which was refused, was not a correct statement of the law; and, moreover, other instructions were given which covered the matter fully. It is not correct to use the words "absolutely incompatible." That means that the guilt must be established beyond the possibility of a doubt. (State v. Rover, 13 Nev., 24; State v. Ferguson, 9 id., 118; State v. David, 131 Mo., 386; Carlton v. People, 150 Ill., 181; Cornish v. Ter., 3 Wyo., 95; People v. Davis, 64 Cal., 440; State v. Glass, 5 Ore., 81; 1 Greenleaf Ev., Sec. 32; Jones v. State, 32 S. W., 81; Green v. State, 38 Ark., 316; Roberts v. State, 34 S. E., 203; Smith v. State, 31 So., 806; Thompson v. State, id., 726; Barnes v. State, 111 Ala., 56; Harvey v. State, 125 Ala., 47; State v. Johnson, 37 Minn., 493; State v. Seymour, 94 Ia., 699.) It is not error to refuse an instruction when the subject is fully covered by one given. (Olive v. State, 7 N. W., 444.)

No objection was interposed at the time to the alleged improper remarks of the Prosecuting Attorney. No opportunity was given the court to admonish the jury not to be influenced by such remarks. On motion for new trial, the trial court found that there had been no prejudicial remarks. And when the language objected to is considered in the light of the surroundings, they will not be found prejudicial. (Ter. v. Cordova, 68 Pac., 920; State v. Laudano, 51 Atl., 863; Lide v. State, 31 So., 959; Vaughan v. State, 58 Ark., 368; State v. Johnson, 48 La. Ann., 91; Ross v. State, 8 Wyo., 351; Rambo v. State, 69 S. W., 164; State v. Procella, 29 So., 967; State v. Fourchy, 51 La. Ann., 24; State v. Mack, 45 id., 1156: State v. Williams, 32 So., 172; Warren v. Nash, 67 S. W., 274; Martinez v. State, 57 S. W., 838; State v.

Biggerstaff, 43 Pac., 710.) The objection was waived by failure to make the same at the time of the alleged misconduct. (Comm. v. Weber, 31 Atl., 480; Stepp v. Hatcher, 67 S. W., 819; Warren v. Nash, *supra;* State v. Laudano, *supra;* State v. Hossack, 89 N. W., 1077; Reynolds v. Pearson, 64 N. E., 484; Reed v. State, 92 N. W., 321; Moore v. State, 70 S. W., 89; State v. Sale, 92 N. W., 680; Hoyle v. State, 70 S. W., 94; Beberstein v. Ter., 58 Pac., 641; State v. Stockman, 58 Pac., 1006; Ry. v. Cotton, 29 N. E., 904; Wheeless v. State, 18 S. E., 303; Welsh v. Brown, 35 N. E., 921; Currier v. State, 157 Ind., 114; People v. Shears, 133 Cal., 154; People v. Brittain, 50 Pac., 664; Bohanan v. State, 24 N. W., 391; Bradshaw v. State, 22 N. W., 361; State v. McCool, 9 Pac., 618; State v. Forsyth, 1 S. W., 834; Miller v. State, 25 S. W., 634; Johnson v. Com., 55 S. W., 437; State v. Ward, 61 Vt., 163; Hill v. State, 60 N. W., 916; State v. Watson, 63 Me., 128; State v. Johnson, 20 S. E., 988; Ivey v. State, 39 S. E., 424; Morgan v. Duffy, 30 S. W., 735; Lewis v. State, 64 S. W., 240; People v. Kramer, 117 Cal., 647; Young v. State, 65 Ga., 525; Earll v. People, 99 Ill., 123; Barber v. State, 31 S. W., 649.)

Where interference of strangers with the jury is unattended with corruption on the part of the latter, and has not been prompted by a party, and it does not appear that any injustice has thereby been done, the verdict will not be disturbed, whether the cause be civil or criminal. (2 Graham & Waterman on New Trials, 317; King v. State, 91 Tenn., 628; Turner v. State, 89 id., 564; State v. Miller, 24 W. Va., 802; Caswell v. Pitcher, 10 Atl., 453; McTyer v. State, 91 Ga., 256; People v. Boggs, 20 Cal., 432.) The alleged irregularities in the proceedings of the jury were not such as to cause a vacation of the verdict. (State v. Cucuel, 31 N. J. Eq., 249; People v. Kelley, 46 Cal., 356; Brown v. State, 65 Ga., 332; State v. Yordi, 30 Kan., 221; 14 Ency. Pl. & Pr., 965; Bunce v. McMahon, 42 Pac., 23; Snodgrass v. State, 36 Tex. Cr., 208; Hilton v. Comm.,

16 S. W., 826; Dancy v. State, 41 Tex. Cr., 294; State v. Keifer, 1 N. W., 1117; Hilliard New Tr., Sec. 61; State v. Allen, 89 Ia., 51; State v. Crane, 15 S. E., 232.)

POTTER, JUSTICE.

On information filed in the District Court of Laramie County, charging him with the murder of one William Nickell, the plaintiff in error, Tom Horn, was tried in said court and convicted of the crime of murder in the first degree, and sentenced to suffer the penalty of death imposed by statute upon that crime. Before sentence was pronounced a motion for new trial was filed and overruled, to which exceptions were reserved. The grounds of the motion, speaking generally, were the insufficiency of the evidence to sustain the verdict, alleged errors of law occurring in the admission and exclusion of testimony, and in the giving and refusing of certain instructions to the jury, alleged misconduct of the prosecuting attorney in his argument to the jury, and irregularities in the proceedings of the jury. The only specification of error in this court is that the District Court erred in overruling the motion for new trial. This brings up for review each matter properly presented to the court below by such motion, and not abandoned or waived by failure to discuss or refer to the same in the brief of counsel. The points relied on to sustain this assignment of error will be disposed of in their order, as briefly as may be consistent with the importance of the questions involved.

1. It is contended with much earnestness that the verdict is not supported by sufficient evidence. This proposition was presented in brief and upon oral argument with unusual skill, and the same is true of the manner of presentation of the other side of the question by counsel for the State. Indeed, on the whole case the arguments both for the plaintiff in error and the State were not only able and instructive, but displayed immense labor and research, and it is doubtful, to say the least, if in any criminal case

this court has ever listened to more able or learned arguments.

The deceased, William Nickell, usually referred to in the record and by counsel as "Willie Nickell," was a boy fourteen years of age, of average size, residing at the time of the homicide on a ranch in the neighborhood of Iron Mountain, in Laramie County, this State, with his parents, Kels P. and Mary Nickell. The testimony quite conclusively establishes the fact, and it is not disputed, that he met his death as the result of two gun shot wounds inflicted by some other person on Thursday, July 18, 1901, at about 7 o'clock in the morning, at or in the proximity of a gate about three-fourths of a mile from his home on the road leading from the latter place to Iron Mountain. The family had breakfast on that morning about 6 o'clock, and soon thereafter the father, accompanied by his brother-in-law and Mr. Apperson, a surveyor, left the house for the purpose of doing some surveying. As they were leaving Willie was seen by them at the corral arranging to go on an errand for his father to Iron Mountain, his mission being the employment of a sheep herder. They went in an easterly direction from the house about a mile and a half, and as they were about ready to commence their work they heard three shots fired, seeming to come from the direction of the gate, where the shooting was afterward found to have occurred. Some remark was made about it. Mr. Apperson testified that Mr. Nickell said something to the effect that he wondered who fired those shots, that the reports were too loud for the gun carried by Freddie, a younger son, but the matter was given no further attention. They all agree that the shots were heard at about 7 o'clock.

Shortly after Mr. Nickell and his companions had departed, and at about 6:30 o'clock, or twenty minutes to 7, according to the testimony of Mrs. Nickell, Willie left, going in a westerly direction, and was last seen by his mother as he was going around the house up the road. He was on horseback. He was not afterward seen alive

by any member of the household. The fact that he did not return that evening occasioned, as the father testified, a little alarm, but no effort was then made to locate him, for the reason, as stated by Mr. Nickell, that he supposed the boy had failed to overtake the man he was seeking at Iron Mountain, and had continued his journey beyond that point.

The following morning, Friday, July 19, 1901, at about 8 o'clock, Fred, a younger brother, took the cows out, going in the direction and, as we understand, along the road traveled by Willie the day before, and he soon returned crying, and stated that Willie was killed at the gate. Mr. Nickell and Mr. Apperson started immediately for the gate, and they were shortly followed by the brother-in-law aforesaid and Mrs. Nickell. The body was found lying on its back in the road, with the head turned toward the house. The theory of the prosecution is that the boy had fallen on his face, and that the body had been turned over, owing to its situation, and the fact that the clothing was saturated with blood and gravel was sticking to the face and clothing; and that was the opinion of the witnesses who discovered the body, and seems also to have been the opinion of at least some of the physicians called to give expert testimony. Under the head of the body was a small·stone, or a "little rock," as expressed in the testimony, which appeared to have been placed there by someone. The body was found at a point sixty-five feet from the gate, which was open and lying down. Near the body was a pool of blood, and another pool was found at or very close to the gate, and between the gate and the body patches or spots of blood were found in the road.

We conceive it to be an undisputed theory in the case, at least every indication seems to point to it, that the boy was shot when he was standing at or very near the gate, and that he ran toward the house, falling where his body was discovered or close to that spot. The missiles entered the body on the left side, passing entirely through it. The

wounds upon the body were described with accuracy by the physicians who conducted the post mortem examination. One wound penetrated the chest approximately on the axillary line, striking the fifth rib, taking an inward, forward and slightly downward course, producing a large wound of exit at the juncture of the sixth rib with the sternum; and the point of entrance of the other wound was three inches posterior to the left axillary line and two inches above the ileum, taking an inward and slightly downward course, penetrating the abdominal viscera, making a wound of exit one inch above the crest of the ileum and two inches anterior to the right axillary line.

To connect the plaintiff in error with the murder the prosecution relied upon a confession in connection with circumstantial evidence. The alleged confession was made to one Joe Lafors, a Deputy United States Marshal, in the office of the United States Marshal at Cheyenne, on January 12, 1902, and was overheard by two other witnesses, viz., Leslie Snow, a deputy sheriff of Laramie County, and Charles Ohnhaus, a stenographer, who had secreted themselves in an adjoining room of the marshal's office behind a closed door separating the two rooms. They had thus secreted themselves in anticipation that Lafors might succeed in causing the plaintiff in error to talk about the murder, and his connection with it. No question is involved of duress or threats in respect to the confession, nor is there any claim that the confession was inadmissible as being involuntary or for any other reason. Lafors was not an officer of the county, and was not officially charged with any duty to discover or arrest the perpetrator of the crime; but his relation to the affair was that of detective. At the time of the confession the plaintiff in error was not under arrest, and had not been publicly accused of the murder. The explanation of the plaintiff in error is that what he said in the conversation with Lafors was spoken in joke or said as a "josh;" but it is contended in addition to that, by counsel, that the plaintiff in error was in an in-

toxicated condition, and that he was given to boasting when
in that condition, and that on the occasion referred to he
was merely bragging about things that were not true and
"joshing" Lafors.

At the time Horn did not know that any other person
was present and listening to his talk with Lafors.    The
confession, as it is called, was brought out in the course
of a conversation between Horn and Lafors, and con-
sisted of answers by the former to several questions pro-
pounded by the latter in reference to the killing of Willie
Nickell, in which Lafors assumed that Horn had done the
killing.    Lafors had recommended Horn to some Montana
parties as a good man to do some detective work in that
state in regard to the stealing of cattle.    The conversation
was brought about through that circumstance, and can be
better explained by a brief reference to the correspondence
relating to that matter.    One Smith had written to Lafors
the latter part of December from Miles City, Montana,
partly as follows:  "I want a good man to do some secret
work.    And I want a man that I can trust.    And he will
have to be a man not known in this country.    The nature
of the work is this:  There is a gang over on the Big Ma-
son River that are stealing cattle and we propose to fit the
man out as a wolfer and let him go into that country (and
wolf) and if he is the right kind of a man, he can soon
get in with the gang.    He will have to be a man that can
take care of himself in any kind of country."    This letter
was sent to Horn, and soon thereafter the latter replied
by letter to Lafors, stating in substance that he would ac-
cept the employment.    In that letter he wrote:  "I would
like to take up that work and I feel sure I can give Mr.
Smith satisfaction.    I don't care how big or bad his men
are, or how many of them there are.    I can handle them.
They can scarcely be any worse than the Brown's Hole gang
and I stopped the cow stealing there in one summer.  .  .  .
You may write Mr. Smith for me that I can handle his
work and do it with less expense in the shape of lawyer

and witness fees than any man in the business. Joe, you yourself know what my reputation is, although we have never been out together." Again, on January 7, Horn wrote to Lafors stating that he was obliged to him for the trouble he had taken in the matter and added: "I will get the men sure, for I have never yet let a cow thief get away from me unless he got up and jumped clean out of the country. I will come to Cheyenne to get my pass, as I can get one to Helena, or any other point from Cheyenne. I can go at any time after ten days. I will see you in Cheyenne when I come in."

At this time and for several years prior thereto Horn made his home at a cattle ranch in the neighborhood of Iron Mountain, where he was employed as a stock detective. He testified that it was his business to ride on the range alone and look after the interests of the company; that he kept track of the cattle in the country in a general way, and as closely as possible drove home all cows and calves he found belonging to the company in the pastures of other people; and that he kept as good track as he could of the people in the country that were killing and marketing beef—everything of that nature that will have a tendency to protect the interests of the company.

With this much by way of introduction, we will proceed as briefly as possible to set forth as much of the conversation between Horn and Lafors as may seem necessary to a correct understanding of the case, omitting the profanity as much as possible. We shall refer particularly to the testimony of the witness Ohnhaus, who took down the conversation in shorthand; but it should be remarked that the three witnesses—Lafors, Snow and Ohnhaus—agree substantially as to what was said.

After Lafors and Horn entered the marshal's office, the former handed the latter a letter, remarking: "Here is your letter of introduction to Mr. W. G. Pruitt, which reads as follows," and he proceeded to read it aloud. Then Horn said: "I want to go on the Union Pacific. I know

the route and I don't know the others." Joe (meaning Lafors) said: "It is about as near one way as the other, and you will get there about the same time." After one or two remarks on this line Horn said: "Well, Joe, do you know anything about the nature of the work I will have to do up there?" Joe said: "Tom, they are good people, I have worked for them five or six years; you will have to get right in among them and gain their confidence and show them you are all right." Horn said: "I don't want to be making reports to anybody at any time. I will simply have one report to make, and that will be my final report. If a man has to make reports all the time, they will catch the wisest —— —— —— on earth. These people are not afraid of shooting, are they?" Joe said: "No, they are not afraid of shooting." Horn said: "I shoot too much, I know; you know me when it comes to shooting. I will protect the people I am working for, but I have never got my employers into trouble yet over anything I have done. A man can't be too careful, because you don't want any —— —— officers to know what you are doing." Joe said: "Tom, I know you are a good man for the place. You are the best man to cover up your trail I ever saw. In the Willie Nickell killing I could never find your trail and I pride myself on being a trailer."

Horn said: "No, —— —— I left no trail. The only way to cover up your trail is to go barefooted." Joe said: "Where was your horse?" Horn replied: "He was a —— long ways off." Lafors said: "I would be afraid to leave my horse so far away, you might get cut off from him," to which Horn replied: "You don't take much chances. These people are unorganized, and, anyway, I depend on this gun of mine. The only thing I was ever afraid of was that I would be compelled to kill an officer or a man I didn't want to, but I would do everything to keep from being seen, but if he kept after me I would certainly kill him." The conversation then continued as follows:

Lafors: "I never knew why Willie Nickell was killed. Was it because he was one of the victims named, or was it compulsory?"

Horn: "I think it was this way: Suppose a man was in the big draw to the right of the gate—you know where it is—the draw that comes into the main creek below Nickell's house, where Nickell was shot. Well, I suppose a man was in that and the kid came riding up on him from this way, and suppose the kid started to run for the house, and the fellow headed him off at the gate and killed him to keep him from going to the house and raising a hell of a commotion. That is the way I think it occurred."

Lafors: "Tom, you had your boots on when you ran across there to cut the kid off, didn't you?"

Horn: "No, I was barefooted."

Lafors: "You didn't run across there barefooted?"

Horn: "Yes, I did."

Lafors: "How did you get your boots on after cutting up your feet?"

Horn: "I generally have ten days to rest after a job of that kind. Joe, do you remember the little girl?"

Lafors: "Who do you mean?"

Horn: "The school marm. She was sure smooth people. She wrote me a letter as long as the Governor's message, telling me in detail everything asked by Stoll, the prosecuting attorney. Stoll thought I was going to prove an alibi, but I fooled him. I had a man on the outside keeping me in touch before I showed up with everything that was going on. I got this letter from the girl the same day I got my summons to appear before the coroner's inquest."

Lafors: "Did the school marm tell everything she knew?"

Horn: "Yes, she did. I would not tell an individual like her anything, not me. She told me to look out for you. She said, look out for Joe Lafors; he is not all right; look out for him, he is trying to find out some-

thing. I said, what is there in this Lafors matter? She said Miller didn't like him and said he would kill the —— — — —— if God would spare him long enough. There is nothing to those Millers. They are ignorant old jays. They can't even appreciate a good joke. The first time I met the girl was just before the killing of the kid. Everything you know dates from the killing of the kid."

Lafors: "How many days was it before the killing of the kid?"

Horn: "Three or four days, maybe—damned if I want to remember the dates. She was there, and of course we soon paired ourselves off."

Lafors: "What nationality was she?"

Horn: "She was one-quarter Jap, one-half Korean, and the other German. She talks almost every language on earth."

Lafors: "Tom, didn't Jim Dixon carry you grub?"

Horn: "No; no one carried me grub."

Lafors: "Tom, how can a man that weighs 204 pounds go without eating anything so long?"

Horn: "Well, I do. For some times I go for some days without a mouthful. Sometimes I have a little bacon along."

Lafors: "You must get terribly hungry, Tom."

Horn: "Yes; sometimes I get so hungry that I could kill my mother for some grub, but I never quit a job until I get my man."

Lafors: "What kind of a gun have you got?"

Horn: "I used a 30-30 Winchester."

Lafors: "Tom, do you think that will hold up as well as a 30-40?"

Horn: "No, but I like to get close to my man. The closer the better."

Lafors: "How far was Willie Nickell killed?"

Horn: "About 300 yards. It was the best shot that I ever made and the dirtiest trick I ever done. I thought at one time he would get away."

Lafors: "How about the shells? Did you carry them away?"

Horn: "You bet your ―― ―― ―― life I did."

Lafors: "Tom, do you need any more money for this trip?"

Horn: "No. If I get a pass I will not need any more money. If I have to buy a ticket, I must have a little more money; but today is Sunday, and I will have to wait until tomorrow."

Lafors: "Well, it is after noon and I will go home and see you again this afternoon or this evening, when we can talk this matter over."

Horn: "All right, I will be back. I want to know all about these people before I go up there."

Lafors: "Tom, let us go down stairs and get a drink. I could always see your work clear, but I want you to tell me why you killed the kid. Was it a mistake?"

Horn: "Well, I will tell you all about that when I come back from Montana. It is too new yet."

Horn and Lafors then left the office, but they returned in the afternoon, when the conversation was continued as follows:

Horn: "Joe, we have only been together about fifteen minutes, and I will bet there is some people saying, 'What are these ―― ―― ―― planning now, and who are they going to kill next?' We have come up here because there is no other place to go. If you go to the Inter Ocean (Hotel) to sit down and talk a few minutes, someone comes in and says, 'Let us have a drink,' and before you know it you are standing up talking, and my feet get so ―― tired it almost kills me. I am 44 years, 3 months and 27 days old, and if I get killed now, I have the satisfaction of knowing I have lived about fifteen ordinary lives. I would like to have had somebody who saw my past, and could picture it to the public. It would be the most ―― ―― interesting reading in the country; and if we could describe to the author our feelings at different times, it

would be better still. The experience of my life, or the first man I killed, was when I was only 26 years old. He was a coarse son — — —."

Lafors: "How much did you get for killing these fellows? In the Powell and Lewis case you got $600 apiece. You killed Lewis in the corral with a six-shooter. I would like to have seen the expression on his face when you shot him."

Horn: "He *was* the scaredest son — — — you ever saw. How did you come to know that, Joe?"

Lafors: "I have known everything you have done, Tom, for a great many years. I know where you were paid this money."

Horn: "Yes, I was paid this money on the train between Cheyenne and Denver."

    *    *    *    *    *    *    *    *    *

Lafors: "Why did you put the rock under the kid's head after you killed him? That is one of your marks, isn't it?"

Horn: "Yes, that is the way I hang out my sign to collect my money for a job of this kind."

    *    *    *    *    *    *    *    *    *

Lafors: "Have you got your money yet for the killing of Nickell?"

Horn: "I got that before I did the job."

Lafors: "You got $500 for that. Why did you cut the price?"

Horn: "I got $2,100."

Lafors: "How much is that a man?"

Horn: "That is for three dead men, and one man shot at five times. Killing men is my specialty. I look at it as a business proposition, and I think I have a corner on the market."

It appears that when they returned to the office in the afternoon the conversation at first consisted of stories told by each about various troubles they had been connected with; and such stories concerned the killing of people

years ago, as we are led to understand from the testimony, but they are not related in the evidence; and the witness Ohnhaus did not take down that part of the conversation. It is argued that these two parties—Horn and Lafors—were merely exchanging stories, or each telling yarns, and trying to see which could tell the tallest yarn about killing people; and that the recital by Horn of his connection with the crime in question was merely one yarn among others that he told which had no existence in fact. The witness Ohnhaus testified that he took down everything with the exception of the stories told immediately after they came into the office in the afternoon; and he read or testified to all the conversation contained in his notes.

It is proper to state, before passing in review the other circumstances in the case, that Horn, testifying in his own behalf, admitted making all these statements to Lafors at the time mentioned. While admitting that he had been drinking some, he testified that he knew what he was saying, and he remembered all of it except that he did not remember having said that it was the best shot he had ever made and the dirtiest trick he had ever done. He testified, however, that if the witness Ohnhaus had so taken it down, he did not doubt his having made the statement. He explained the affair by stating that everything was said as a "josh." He says that he saw that Lafors was assuming and insinuating that he had killed Willie Nickell, and he did not wish to disappoint him, but would have said or admitted anything that he thought would please him. He testified further that, at one point in the conversation, he was afraid that Lafors would discover that he was lying. He denied, when testifying, that he killed the boy or that he had ever killed anyone.

The three witnesses to the conversation testified that, although the plaintiff in error may have been drinking, he was not drunk, but was sober, and Lafors and Snow testified that his manner during the conversation was sincere. On the other hand, the defense introduced several wit-

nesses who saw him on that day and the preceding evening, and they testified that he was drinking and was under the influence of liquor and quite talkative; and that he was usually given to talking considerably and boasting when in that condition, but that at other times he was not so inclined, but was quiet.

It is contended quite strenuously that some of the facts in the case are in conflict with the admissions or statements made by Horn in his conversation with Lafors, and render it extremely improbable, if not impossible, for the killing to have occurred in the manner explained by him in that conversation. Counsel disagree, in the first place, as to the place where Horn intended by his statement to Lafors to place the person who did the killing. For the defense it is insisted that the right of the gate would be the north side, or on the right of a person standing at the gate looking west; while the prosecution construe the position as the right to one who would be looking east. Counsel for the defense contend that it would have been impossible for a person to have gone barefoot over the ground from the supposed location of the assailant north of the gate, without great injury to his feet, and it was shown by a witness who slept with Horn in Laramie a few nights after the killing that his feet did not appear to have been injured. Counsel also contend that the remarks or admissions of Horn were the ravings or vaporings of an intoxicated man, without any regard to the truth. Another point of conflict claimed to exist between the facts and the confession is in relation to the gun Horn said he used. It is claimed, and there is some expert evidence to that effect, that the wounds could not have been produced by a 30-30 Winchester.

It is unnecessary, we think, to enter upon any discussion of the probable location of the boy's assailant. Maps and photographs in abundance were produced in evidence showing every material detail of the topography of the country; and it was minutely described by witnesses. In this respect Horn's statements, and the character of the country,

were before the jury, as well as all the other facts in the case.

We come now to a brief rehearsal of some of the other material circumstances that are claimed to corroborate the confession of the plaintiff in error, or tend to connect him with the crime independent of that confession. In the first place, no witness testifies to having seen anyone in the immediate vicinity of the place of the killing on Thursday, the date of the crime. But the prosecution introduced testimony showing the presence of Horn in the neighborhood from Sunday evening, the 14th, up to Wednesday evening, the 17th. And the facts thus established were admitted by the plaintiff in error.

Horn arrived at the ranch of William Clay Sunday evening, and he stayed there that night. He departed from Clay's house Monday morning, returned between 1 and 2 o'clock in the afternoon and shortly went away again. Clay's ranch is located north and in the immediate neighborhood of the Nickell ranch. We are not certain that the evidence shows that the two places adjoin each other, but it is clear that they are not far apart. The two houses, we believe, are not to exceed two or three miles apart, and the distance may be even less than that.

Monday morning at about 10 o'clock he appeared at the ranch house of one Miller, and made that place his headquarters until about 9 or 10 o'clock Wednesday morning, the day preceding the killing. He slept there Monday and Tuesday nights. Tuesday morning he and Mr. Miller went fishing a short time; and about 4 o'clock in the afternoon he had his horse brought up, and he rode away, going, as he stated, to what is known as the tree claim. He was absent about one hour. On his return he remarked that he had seen Nickell's sheep in the Miller pasture. Horn testified that he went to see if the Nickell sheep were in any of the pastures belonging to his employer, and found that they were not. Wednesday morning when he left the Miller place he rode in a southerly direction. The Miller

ranch is also situated in the immediate neighborhood of the Nickell ranch and south of it. The house is situated about one mile from the gate where the shooting occurred. On all these occasions Horn was riding a black or brownish black horse with a roached mane. He had a pair of field glasses with him, and carried a 30-30 Winchester rifle. He was without a coat, being in his shirt sleeves, as the witnesses express it. On Tuesday Miller and his two sons and Horn occupied a portion of the time in shooting at marks, Horn using his own gun. One of the Miller boys had a 30-30 Winchester and the other a 30-40 Winchester, which were used on that occasion. A school teacher lived at the Miller ranch, it seems, and she and Horn, as the witnesses testify, were talking together much of the time when she was at the house.

The witness Bray, who owned a ranch about two miles north of Clay's place, had been working for Clay on Monday, the 15th, and saw Horn when he returned to Clay's, as he says, about noon of that day. On Wednesday evening, on returning home from Clay's, where he had been working, not long after 6 o'clock, he again saw Horn off and to the west of the road and off his horse, about a mile and three-quarters northwest of the Clay place. His horse was about twenty-five feet from him and toward the south. He seemed to be doing nothing at the time but standing there. Soon after the witness arrived home he again saw Horn, on horseback, as we understand, going toward the road that took him in the direction of the Sybille. He was then west of the Bray place, and about half a mile away, where a turn is made to go west. The witness saw him until he passed over the hill. This would bring Horn on Wednesday evening about four to five miles north of the Nickell ranch. And it is, therefore, apparent that, although he had gone in a southerly direction when leaving Miller's, he had changed his course at some time during the day, so as to bring him north of both the Miller and Nickell ranches. Indeed, Horn himself says that after

leaving Miller's, he first went up the creek away from Nickell's, then swung around, crossing the South Chugwater in below Nickell's, and afterward went through the Nickell pastures.

From this time until the following Saturday there is much conflict in the testimony concerning the whereabouts of the plaintiff in error. The prosecution introduced a witness who testified to having seen him just outside of Laramie City, riding into that place about noon on Thursday, and an attempt was made to show that he had put his horse about that time in a certain stable in Laramie, and that the condition of the horse made it evident he had made a rapid ride that morning. Laramie City is about thirty-five to thirty-eight miles from the place where the crime was committed. The theory of the prosecution is that, immediately after the killing, Horn rode to Laramie. Horn testified that he did not go into Laramie until Saturday; and that from Wednesday evening until Saturday he remained in the country and from seven to ten miles from the Nickell ranch, riding the range and looking over pastures in the day time, and sleeping out at night, with nothing to eat except some bacon and bread, which he had previously secreted at some point near the Bray place and took again into his possession Wednesday evening, in addition to a rabbit or two that he killed and roasted; and that Saturday he went into the ranch where he lived, changed his clothes, obtained a different horse—changing to a dark bay called "Pacer," and after eating dinner went to Laramie City. His statements as to the time he arrived at the ranch, the changing of horses, and his departure for Laramie is corroborated by several witnesses, who were at the ranch on Saturday.

On behalf of the prosecution, a witness not already mentioned testified that he met Horn in a saloon at Laramie Friday evening. The books kept at the stable where Horn put up his horse showed that his horse was there ten days, from July 20 to July 30. The entry was made up, not at

the time the horse was entered at the stable, but when it was taken away; and an effort was made to show that the entry may have been incorrect as to the time when the horse was first received at the stable. The horse ridden into Laramie by Horn was the bay horse "Pacer."

The defense produced a witness who testified to having seen Horn riding across the country Thursday morning about twenty-five miles south of the place where the crime was committed, but the veracity of this witness was impeached by several witnesses; and, notwithstanding that others were called on behalf of the defense to show his good reputation for truth and veracity, the jury may have refused to credit his testimony. Moreover, it may be said that Horn's recital of his wanderings does not seem to place him Thursday morning where the witness claims to have observed him.

One other item of evidence deserves mention. In explaining the killing of deceased, Horn referred to a place where Nickell was shot, and it cropped out in the testimony of Mrs. Nickell, in recalling a certain date, that Mr. Nickell had been shot about seventeen days after the boy had been killed. In Horn's testimony he had claimed that the conversation with Lafors was the result or had "emanated," as he put it, from previous conversations between them, when they had been talking about killing people, and in which conversations Lafors wanted him to assist him in fastening the crime upon another party. On rebuttal, Lafors, in referring to such previous conversations, testified in effect that Horn admitted having shot at Mr. Nickell. This evidence was objected to, and it is now urged that error was committed in its admission. But it was before the jury, and we are now considering the contention that the verdict is not sustained by the evidence.

It appeared in evidence that Nickell was the only person in that neighborhood who had sheep. It is a matter so notorious that the jury might have considered it that more or less enmity between cattle and sheep owners is frequently

the result where cattle and sheep are kept in the same local-
ity, and the rights or claims to the range of the cattle
growers is not scrupulously observed by sheep men.   It
was disclosed by the evidence that Horn was watching the
Nickell sheep.   He testified to that fact himself, and he
reported the same fact on Tuesday when he returned to
the Miller ranch, after being absent about an hour.   It is
true that he testified to riding through and observing the
pastures of a number of other ranch owners in the neigh-
borhood during his sojourn in that region at that time.
From his own testimony it appeared that his usual habit
and purpose was to avoid being seen by · the ranchmen.
His business was to a certain extent of a secret character;
and it was not an unusual thing, according to his testimony,
for him to sleep out at night with no covering other than
his saddle blanket, and with but little to eat except some
bacon and bread that he carried with him.   Nevertheless,
the jury had the fact before them that up to and including
Wednesday his movements were not secretive; but that
Thursday and Friday, according to his own version of his
travels, he rather avoided observation.   He admits having
been somewhere in that neighborhood Thursday morning.
True, he claims that he was several miles away—seven to
ten miles, we believe.   But as he arose, or might· have
arisen at an early hour, we are unable to say that it was
so manifestly impossible for him to have reached the scene
of the homicide at the time ·it occurred, that the jury would
not be justified in believing him to have been there.

We are not permitted under the law to substitute our
judgment for that of the jury upon the facts.   The theory
of the law is that the jury are the better qualified to pass
upon them.   They are confronted by the witnesses, and
are not only, under the law, the sole judges of their credi-
bility, but they are better enabled to determine that matter
than an appellate court.   In Cornish v. Territory, 3 Wyo.,
96, it was said: "Where there is material evidence tend-
ing to prove the prisoner's guilt before the jury, and the

trial court refuses to set aside their verdict, this court will not reverse the action of both court and jury. It will examine the record to see whether there is evidence upon which a verdict of guilt might reasonably be founded, and, being satisfied on that point, will refuse to interfere, whatever may be its own opinion of the weight or preponderance of the evidence."

In the consideration of the claim, therefore, that the evidence is insufficient to sustain the verdict, and that the trial court erred in refusing to grant a new trial on that ground, the question is not whether the evidence convinces the appellate court beyond a reasonable doubt of the guilt of the accused; but whether if believed by the jury the facts are sufficient to have reasonably justified the verdict. It is not the duty of this court to enter upon the same critical examination of the evidence that was incumbent upon the jury. Our study of the evidence is not for the purpose of arriving at a judgment in our own minds as to the guilt of the prisoner. We review the evidence to ascertain and determine whether in any reasonable view of the facts the jury were justified in returning a verdict of guilty. It is needless to say that we have made a careful examination of all the testimony, and, although it has been most ably argued that the verdict in this case is not supported by the testimony, we are constrained to hold the contrary. Some of our reasons have been already indicated.

It is quite evident that the jury believed the confession of the accused made during his conversation with Lafors; and that they believed Horn to have been in possession of his senses at the time, and that he spoke earnestly, rather than jokingly. To overcome the confession, in addition to the contention that it was not made seriously, it was sought to show on the part of the defense that, standing where Horn indicated he stood, the circumstances did not accord with his statement; and that the wounds upon the boy's body could not have been made with a projectile of the

calibre of 30-30 fired from the Winchester rifle carried by Horn, and which he admitted having used.

Some of the physicians gave it as their opinion that the wounds were produced by a bullet of a larger calibre than 30-30. But it was an opinion only. Dr. Barber, while expressing that opinion, basing it upon the statements of well-known writers on the subject, as well perhaps as upon his own experience, stated that he could not testify with accuracy upon the question; and there is expert testimony in the record to the effect that it is quite impossible to definitely determine the exact calibre of the bullet which produced the wound. In view of what the jury may have believed to be the uncertainty of the expert opinions, while they may have given due respect to the opinions expressed as being not only honest, but founded upon personal experience in some cases, and the result of observations set forth in standard works on the subject, they may have accepted the admission of the accused that he used a 30-30. And we do not think the evidence is to be construed as pointing so positively to the contrary that we should hold the jury unwarranted in that conclusion.

Again, the jury may not have believed that the evidence sustained the theory of the prosecution that Horn made a hurried flight into Laramie Thursday morning. But if not, they may have believed that he remained in the immediate or comparative vicinity of the crime, screening himself from observation until Saturday. It was not essential to their verdict of guilty that it should be found beyond a reasonable doubt that the prisoner rode to Laramie on the day of the crime. It might be conceded also that the proof as to some of the circumstances was calculated to throw some doubt upon the accuracy of Horn in his admission to Lafors of the manner in which the killing was accomplished, allowing counsel to place their interpretation upon his explanation. There are some matters in this connection, and in relation to a few other particulars, that are not made as clear by the record as they apparently were to

the jury. The witnesses occasionally used motions of the hands and arms in indicating what they intended, and those motions are not generally in the record. It seems that in the conversation with Lafors the accused, by a similar method, illustrated to Lafors his remarks. That is not reproduced, and we are, therefore, unable to say what they might have indicated to the jury when explained to them by the witness.

But the explanation of Horn in the confession was given in a very general way, and there does not appear to have been close attention to detail when he was describing how the killing occurred. Moreover, it seems that it was not intended as a complete statement. Lafors testified that Horn said the matter was too new, but he would fully explain when he returned from Montana.

Moreover, the jury had before them such facts as indicated quite strongly that the accused had some object in observing the Nickell ranch or property, and that he would be concerned in preventing a commotion that might be caused if his presence should be noticed. On the entire case we find ourselves unable to say that the evidence was insufficient, and that for such reason the court ought to have granted a new trial, and erred in not doing so.

We ought perhaps to advert to another element in the testimony. Evidence was introduced to establish the fact of certain statements by Horn in Denver tending to inculpate him as the party guilty of this crime. To overcome that evidence it was sought to impeach one of the witnesses to the alleged statements, and to show that at the time when they were alleged to have been uttered Horn was suffering from a broken jaw, and was unable to speak. It is impossible for this court to say what credence was placed upon that testimony, or what effect it had upon the verdict. The evidence was clearly admissible. Indeed, no objections were urged to it. It was before the jury for what they might consider it worth. If the parties who related the occurrence testified to things that were untrue, and had

no foundation in fact, as strenuously argued by counsel, that was a matter for the jury, and is not for this court to determine. In view of the remainder of the testimony, we would not feel justified in reversing the case upon the evidence even if the Denver testimony—so-called—should be entirely disregarded.

2. The refusal of the court to give to the jury the following instruction requested by the defendant on trial is assigned as error:

"The court instructs the jury that the confessions of a prisoner out of court are a doubtful species of evidence and should be acted upon by the jury with great caution."

· Counsel refer to the case of Hay, Executor, v. Peterson, 6 Wyo., 432, as sustaining this instruction. The remarks of the court in the opinion in that case relied upon by counsel were not necessary to a determination of the case. They were used in discussing an altogether different instruction in a civil case with reference to an admission of the plaintiff that nothing was due him. The court had been requested to charge the jury that the admission was *prima facie* evidence of payment. Error was predicated upon the refusal to give the instruction; and the refusal was, held not to be error. In discussing the matter the Chief Justice said the weight to be given to the testimony of mere admissions is to be determined by the jury. Upon that ground the instruction was held improper. But the opinion went on to say that "it may be proper for the court to instruct them that such testimony is usually unsatisfactory and should be received with great caution." It is evident that the court was not deliberately announcing a principle applicable to all cases, and that the inquiry then before the court did not at all depend upon such a doctrine.

It is usually stated as a general rule that verbal admissions ought to be received with great caution. The reason for that rule is given by Greenleaf as follows: "The evidence consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake;

the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party did actually say." The learned author, however, adds: "But where the admission is deliberately made and precisely identified, the evidence it affords is often of the most satisfactory nature." (I Greenleaf on Ev., 14th Ed., Sec. 200.) And, again, in discussing *confessions,* it is stated that verbal confessions of guilt should be received with great caution, because, "besides the danger of mistake, from the misapprehension of witnesses, the misuse of words, the failure of the party to express his own meaning, and the infirmity of memory, it should be recollected that the mind of the prisoner himself is oppressed by the calamity of his situation, and that he is often influenced by motives of hope or fear to make an untrue confession." (Id., Sec. 214.)

In Gay v. State, 2 Tex. App., 127, cited by counsel for plaintiff in error, it is said that the confessions of a defendant should be received with great care and caution, "owing to the fact that such testimony is so liable to be misunderstood, so easily fabricated, and so hard to be contradicted, as the witness deposing to it often locates the time and place when and where there are no other persons present to contradict his story if it is untrue. It has been also forcibly and truly urged that the mind, under the pressure of calamity, is easily seduced, and is liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or truth, as different agitations may prevail." And the learned court quotes the language of Blackstone discouraging a reliance upon confessions for the reason that they are "ever liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accurately, or reported with due precision; and incapable in their nature of being disproved by other negative evidence." (4 Bl. Com., 357.)

Subject to these cautions in receiving and weighing them, it is said by the learned author already cited that "it is generally agreed that deliberate confessions of guilt are among the most effectual proofs in the law. Their value depends on the supposition that they are deliberate and voluntary, and on the presumption that a rational being will not make admissions prejudicial to his interest and safety, unless when urged by the promptings of truth and conscience." (1 Greenleaf on Ev., 215.)

Assuming the correctness of the requested instruction as an abstract legal proposition, it does not necessarily follow that it should in all cases be contained in a charge to the jury where admissions or confessions constitute part of the proof. Every instruction should be applicable to the case. The instruction expressed the law only partially as applied to the facts in the case at bar. In People v. McArron (Mich.), 79 N. W., 944, the trial court had been requested to instruct the jury to the effect that the statements of the defendant at the time of his arrest are to be received with great caution, and the request embodied the reasons therefor as laid down in the authorities. The appellate court held that no error was committed in refusing the instruction. The ground taken was that the facts in the case did not render the instruction necessary. The court say: "According to respondent's own testimony, he did not know he was under arrest when he made the statement. The officer said no more to him than that he wanted him to come down to an inquest; that a boy had been found in front of a new house, and that 'I was with him.' In the light of this testimony, was there any occasion to give the nineteenth request? I think not."

In the case at bar there is no question of the accuracy of the statements. They are admitted to have been said by the defendant himself. He was not under arrest, and had not been publicly accused of the crime. The statements were not misinterpreted. He admits that he intended Lafors to understand that he was acknowledging his commis-

sion of the crime.  His confession or statements were not
the result of hope or fear, or in consequence of any alarm
occasioned by his situation.   The only contention on his
behalf is that he was intoxicated, and on that account was
indulging in boastful or foolish talk, and that he was jok-
ing.   An instruction applicable to the case was requested
by the defendant and given to the jury.   It is as follows:
"You are instructed that before any admissions of the de-
fendant are entitled to receive any weight as admissions,
it must be shown that they were actually intended to be real
and genuine admissions by the defendant of his guilt.   If
the jury find that they were mere idle vaporings or part of
a mere contest in telling yarns, then they are entitled to no
weight whatever as evidence of the guilt of the defendant."

Moreover, at the request of the State, the jury were in-
structed in substance that they were the judges of the fact
whether defendant was under the influence of liquor at the
time, and that the confession was entitled to that weight
which the jury might think it entitled to, and that it was
for the jury to determine whether they were sincere state-
ments of the defendant admitting his participation in the
killing of the deceased; and the court said, among other
things: "A confession voluntarily made, no matter
through what motive, and correctly reported, is admissible;
but it is exclusively for the jury to determine what weight
they will give to the confession." That instruction in-
formed the jury also that there could be no doubt of the
language used by the defendant, under the testimony in
the case, and it properly left the jury to determine whether
or not the defendant was serious at the time or joking, or
under the influence of liquor to such an extent as to render
his statements unreliable.   It thus appears that all the law
upon this subject applicable to the case was given.   We
think the request was properly refused.

3.  It is further contended that the court erred on the
trial in refusing to permit the defendant to introduce cer-
tain evidence to show motive and opportunity of other per-

sons to commit the crime. This question arises in two ways. On the cross-examination of Kels P. Nickell, the father of the deceased, a witness for the State, the fact was brought out that there had been some trouble between the deceased and Miller and his two boys, Gus and Victor. The witness stated that he had not seen the trouble, but it had been reported to him. The question was then asked whether there had not been trouble between the witness and Miller likewise. Objection being interposed on the ground that it was not proper cross-examination, it was sustained. The following question was also propounded to the witness and an objection thereto sustained on the ground that it was not proper cross-examination: "Do you know whether the Miller boys generally carried a gun?" On the cross-examination of Victor Miller, a witness for the State, he was asked these questions: "As a matter of fact, there is a good deal of trouble in that neighborhood between Nickell and his neighbors?" "Personally, you had trouble with Willie Nickell yourself?" "You had once in your father's presence a difficulty with him, when you offered to fight him, and your father told you to fight him; and Willie run you down with a horse, and your father pulled a pistol and told him if he did that he would shoot the horse? That is a fact, is it not?" "That occasion you had such trouble with Willie in June—whether such a trouble did not occur in June immediately prior to the killing of Willie Nickell?" These questions were severally objected to as immaterial and not proper cross-examination, and the objections were sustained. No offer of proof was made other than the information contained in the questions. Counsel did not offer or state what the answers would be or what it was expected to prove other than by asking the questions. But the objections that the questions were improper on cross-examination were well taken. Nothing of the kind had been elicited on direct examination, and no sort of reference had been made on the examination in chief of either witness to the relations existing between the Nickell

family and its neighbors, or between Willie and the Miller family or any of its members. On the direct examination of Victor Miller, his testimony was confined to the presence of Horn at the Miller ranch, and his actions while there, and the location and ownership of some of the neighboring pastures. It is not claimed that there was any other purpose behind the questions than to show affirmatively a motive in other persons to commit the crime, and possibly an ability to have committed it. It does not appear that they were intended to affect the credibility of the witness. Indeed, we do not understand that the circumstances testified to in chief by the witness Miller are among the disputed facts in the case.

However, the defense produced one Whitman as a witness and propounded to him the following question: "You may state what, in July, 1901, was the relation of the Nickell family to its neighbors?" Objection was interposed on the ground of immateriality, whereupon counsel stated: "I desire to prove that there were feuds, not with one, but with two or three, immediate neighbors that resided there in the vicinity, and the character of the feuds, and that there had been threats of killing on both sides, and that both Mr. Nickell and Mr. Miller had been bound over to keep the peace to one another;. and the general situation in that community." The objection was sustained.

It is urged that the court erred in these various rulings, and to support the contention the rule is invoked that where the State depends on circumstantial evidence to convict a defendant any testimony tending to show that some other person committed the crime is admissible. Counsel state the rule broader than that, and insist that testimony may be introduced tending to show that another person *may have* committed the crime; and the rule is so stated by some courts. But we think it is not generally or usually held that facts are competent which have no further effect than to cast a bare suspicion upon another. It is generally conceded that a defendant in a criminal case may, for the purpose of establishing his own innocence, prove such facts as

tend to show that another is the guilty party where the identity of the one committing the crime is a material point in issue. The question propounded to the witness Whitman does not on its face disclose a purpose or an ability to show such facts. In determining the admissibility of the testimony, therefore, the court had no further guide than the offer of proof made by counsel. Upon that offer, therefore, it is for this court to decide whether the exclusion of the testimony was or was not erroneous.

One of the prominent rules of evidence is that it must tend to prove the issue. It is not necessary that every fact should bear directly upon the issue, but it becomes admissible if it tends to prove the issue, or constitutes a link in the chain of proof. The rule excludes all evidence of collateral facts which are incapable of affording any reasonable presumption or inference as to the principle fact or matter in dispute, and the tendency of which is to divert the mind from the point in issue, and to excite prejudice and mislead or confuse the jury. (1 Greenleaf on Ev., Secs. 51, 52; Gillett on Indirect & Coll. Ev., Sec. 54; Com. v. Abbott, 130 Mass., 472.)

The identity of the person who shot the deceased was a material point in dispute in the case. True, the prosecution relied upon a confession of the defendant, as well as upon proof of circumstances to establish his guilt. But he denied the genuine character of the confession, while admitting the statements attributed to him, denied that he did the shooting, and denied that he was where the killing occurred at the time. We think, therefore, it would have been competent for him to show by proper testimony that the crime was committed by another; and to that end he was at liberty, if within his power, to produce evidence reasonably tending to show such fact. The direct inquiry, therefore, is whether the offer on behalf of the defendant was sufficient to constitute the evidence admissible.

It is evident that no precise rule can be laid down to govern the admission of such evidence in all cases. Much

must depend upon the circumstances of the case, as well as the character of the evidence offered. It is held in some jurisdictions that threats of a third person are inadmissible as being *res inter alios acta.* (See State v. Davis, 77 N. C., 483; Ashton v. State, 63 Ala., 176; Carlton v. People, 150 Ill., 181.) And evidence of mere threats against the life of the deceased without more is not generally held to be competent, for the reason that it has no legal tendency to establish the innocence of the defendant on trial. (State v. Beaudet, 53 Conn., 536; State v. Hawley, 63 Conn., 47; Alexander v. U. S., 138 U. S., 353; Com. v. Abbott, 130 Mass., 472; State v. Beck, 73 Ia., 616; Ogden v. State (Tex.), 58 S. W., 1018; State v. Taylor, 136 Mo., 66; Underhill on Cr. Ev., 332; Gillett on Indirect & Coll. Ev., 54.)

In Commonwealth v. Abbott, *supra,* the Massachusetts court, after stating that as one step towards proving that some person other than the accused committed the crime, the latter had the right to prove such a state of ill feeling on the part of a third person as would furnish him with a motive for the commission of the crime, say: "The existence of ill feeling as a motive for the commission of crime will not alone justify submitting to a jury the question of the guilt of a person entertaining such feeling. It becomes material only when offered in connection with other evidence proper to be submitted, showing that the person charged with such ill feeling was in fact implicated in the commission of the crime." In Carlton v. People, *supra,* it is said: "It is competent for the defendant to show by any legal evidence that another committed the crime with which he is charged, and that he is innocent of any participation in it, but this cannot be shown by the admission or confessions of a third person not under oath, which are only hearsay. The proof must connect such third person with the *fact,* that is, with the perpetration of some deed entering into the crime itself. There must be proof of such a train of facts and circumstances as tend clearly to point to him, rather than the prisoner, as the guilty party."

In the Missouri case above cited, the court held that mere threats by third persons to commit the crime are wholly inadmissible in defense of the party on trial, because such matters are purely hearsay. But it was said that if the offer had been accompanied by the further offer to prove that the one making the threats had done some overt act toward the perpetration of the crime, or even had been seen in the immediate vicinity of the crime, at the time of its perpetration, a different ruling would perhaps be required.

The question was discussed at length in the case of State v. Beaudet, *supra,* and it was held that proof of the threats offered would not have shown the party making them guilty of the murder, nor rendered the circumstances relied upon by the State inconsistent with the guilt of the accused or consistent with his innocence. And the court say: "It does not seem to us possible that the proposed evidence could have impaired in the least the circumstantial evidence against the accused; and surely no one would claim that it could affect the evidence derived from the confession of the prisoner."

Now, the offer in the case at bar was not to show an ill feeling on the part of one individual, but of several, and it was not connected with any other offer to show overt acts on the part of such individuals toward the commission of the crime charged against the prisoner, nor even an opportunity on their part to have perpetrated the crime. Nor was there any evidence to that effect. It must be assumed that no evidence on the subject beyond that proposed was to be tendered. The offer was limited to the showing of a possible motive on the part of someone to do some injury to some member of the Nickell family, and perhaps to take the life of some member of that family. In our judgment, the offer cannot be construed as going beyond that. The proposal to show the general situation in the community we cannot conceive to have been at all competent unless it would have had some relevancy in relation to the *res gestae;* and it is not explained how it would have been material in

that aspect. It was not stated what it was expected would
be proven concerning the general situation except the infer-
ence to be gathered from the remainder of the offer, viz.,
that feuds existed between the Nickell family and its neigh-
bors. In the discussion so far we have omitted any refer-
ence to the fact that the offer of proof was not specially
directed to the killing of Willie Nickell, and that there was
an entire absence of explanation as to what the proof would
show as to the effect of the feuds upon the deceased, and
in what manner they would be shown to be accountable for
his murder.

We do not perceive that the offered testimony would
have had any reasonable tendency to establish the inno-
cence of the defendant. Its effect, if any, could have been
no greater than to generate a mere suspicion that some
other person might have committed the crime solely be-
cause he entertained a feeling of ill will or hatred against
the Nickell family at some time and may have uttered
threats of taking life. The evidence offered does not come
within the rule relied on by counsel for plaintiff in error,
and the court did not err in excluding it.

4. It is contended that prejudicial error was committed
by the trial court in permitting counsel for the State to
interrogate Dr. Barber, a witness called by the State, with
reference to his testimony given upon the preliminary ex-
amination of defendant. The witness was asked whether
he could say anything about the size of the projectile that
produced the wounds upon the body of the deceased with
certainty. He answered: "Not with certainty, but from
actual measurements of the wound of entrance—in the ab-
domen measuring three-eights of an inch—I am of the
opinion that the projectile was a bullet from 38 to 45 calibre."
Counsel thereupon asked him to revert to his testimony on
the preliminary hearing, and whether he remembered of
saying that he could not state with certainty as to the cal-
ibre of the bullet. The question being objected to as an
improper method of examining one's own witness, and

the court remarking that it was preliminary, counsel for the State requested the witness to recall certain questions asked him at the preliminary hearing and his answers thereto, said questions and answers being repeated by counsel, at the conclusion whereof witness was asked if he recalled said questions and answers, and he replied that he did. This question was then propounded: "Do you repeat in substance the same here as your opinion?" It was objected to as leading and in the nature of cross-examination. The court ruled that counsel had the right to interrogate the witness in that way, after calling his attention to his previous testimony. An exception was reserved to the ruling. The substance and effect of the previous statements repeated to the witness were that he could not state accurately concerning the size of the projectiles on account of the decomposition of the body at the time he had examined it; and that decomposition would have a tendency to contract a bullet wound, as far as the muscular tissues were concerned, but might enlarge the point in the skin. The witness stated that he remembered his former testimony, and that he was of the opinion that the bullets were of the calibre he had mentioned, but admitted that he could not testify on that point with accuracy. He also said that, at the time of the preliminary examination, he was of the same opinion as to the calibre of the bullets.

We are unable to perceive that the defendant was materially prejudiced by this examination. The witness expressed his opinion as to the calibre which agreed with the position taken by the defense, but maintained the correctness of his former statement, that he could not testify with accuracy, and so stated at other points in his testimony.

But it is evident from the record that the prosecutor was surprised at the testimony of the witness in the expression of a positive opinion regarding the probable calibre of the projectile that produced the wounds. The witness was one of the physicians who had conducted the post mortem

examination, and was in charge of that work, as we under-
stand it, as acting county physician. It was quite natural,
therefore, for the State to call him as a witness; and it is
apparent that it was expected he would disaffirm the pos-
sibility of determining the size of the bullet causing the
death of the deceased, as a result of his examination of the
body. Under these circumstances it was competent under
our statute for counsel to question him as to his former
testimony to that effect to lay the foundation for con-
tradicting him. Section 3685, Revised Statutes (1899),
provides that a party producing a witness may prove that
he has made, at other times, statements inconsistent with
his present testimony; but before doing so the circum-
stances of the supposed statement sufficient to designate
the particular occasion, as near as may be, must be men-
tioned to the witness, and he must be asked whether or not
he has made such statements, and, if so, be allowed to ex-
plain them. We are of the opinion that the examination
did not transcend the privileges afforded by the statute.
Indeed, in Massachusetts, under a similar statute, it is
held that the surprise of the party calling a witness is not
essential to the latter's contradiction by reference to his
previous statements. (Brooks v. Weeks, 121 Mass., 433;
see also Ryerson v. Abington, 102 Mass., 526; Day v.
Cooley, 118 Mass., 524.)

While it is not necessary to so decide, it is not improb-
able that, without the aid of the statute, the examination
was proper for the purpose of probing the recollection of
the witness, and inducing him to correct the supposed
error in his testimony, as well as to explain the circum-
stances inducing the prosecutor to call him. (Arnold v.
State, 5 Wyo., 439; 1 Greenleaf on Ev. (14th Ed.),
Sec. 444.)

5. Error is predicated upon the admission in evidence
of a cartridge and the circumstances of its discovery. The
cartridge was a 30-30 calibre, and such as might be used
in the rifle carried by the defendant, and which he declared

to Lafors that he employed on the occasion of the killing of the deceased. It was found about two weeks after the homicide, and in the neighborhood of two miles from the scene thereof, on a public highway—the road leading to Iron Mountain—near a gate. It was found by Fred Nickell, a brother of the deceased, and when found was lying in the road in plain view, as though it might have fallen out of a belt.

The theory of the prosecution was that Horn had traveled this road in his flight to Laramie, immediately after the homicide. The country in that locality was very sparsely settled. The road, while a public highway, was evidently traveled but little or by few people. It is difficult, therefore, upon any legal principle, to· define a boundary to the vicinity or neighborhood of the crime. In this respect we think some discretion must be accorded the trial judge. It is true that other persons in the community had the same kind of rifle, and might have kept the same kind of cartridges; but while that fact would lessen the strength of the evidence, we think it would not render it inadmissible, if the time or place of its discovery did not render it incompetent. Although its effect as a circumstance in the case must have been slight, we are not prepared to hold the admission of the evidence to have been erroneous. The jury were doubtless capable of determining the weight to be given to it, and we are not convinced that it was calculated to mislead them. It is argued that in this particular case the prejudice and clamor against the defendant ·were such as to cause the merest trifle to seem like strong proof. The trial court must have been conversant with the situation, and was infinitely more able to judge of that matter than we are, conceding that the situation could be held to affect the admission of testimony.

6.   If there was any error in admitting in evidence, over the objection that they were irrelevant and immaterial, the letter of Horn, of January 7, 1902, to Lafors, and the let-

ter of Smith of Montana to Lafors, of the same date, with reference to the employment of Horn in Montana, we do not regard it as prejudicial. We are inclined to the view that they were admissible to explain the circumstances under which the conversation with Lafors occurred. Other letters in the same connection were admitted without objection. The letter from Horn mentioned his intended visit to Cheyenne. If irrelevant, it is not perceived how they could have operated prejudicially. The only statement in the letters capable of an injurious interpretation is the remark in the Horn letter, that he had never let a cow thief get away from him unless he got up and jumped clean out of the country. That statement may not be inconsistent with the legitimate work of a stock detective. In any view of the matter, we would not feel justified in reversing the case on the ground of the admission of these letters. On his cross-examination the defendant explained very fully what he meant by the expressions in the letters; and just what his duties as stock detective consisted of. He stated in effect that he relied more particularly upon preventing stealing of cattle by staying in the country, and by his presence there rendering it difficult for anyone to steal without his knowledge; and that if he caught a person stealing an animal he would take it away from him. He relied on preventing theft rather than convicting the thief.

7. In discussing the next objection, we will endeavor to state as briefly as possible the facts leading up to it in the order of their occurrence. It will be remembered that, in the conversation with Lafors, the defendant referred to a man shot at five times; and that in the testimony of Mrs. Nickell the fact was incidentally mentioned that her husband had been shot at a time about seventeen days after her son had been killed. On the cross-examination of the defendant on the subject of his conversation with Lafors, upon being asked whether Lafors had used the language as testified to concerning his inability to find the defendant's

trail in the Willie Nickell killing, the defendant said: "That is where the orange blossoms come. He commenced to throw bouquets at me, and I naturally returned the compliment. I commenced to rig myself up." And he stated that the Willie Nickell conversation emanated from previous conversations he had with Lafors regarding the Iron Mountain trouble. The following question was then asked: "In the previous conversation you had with him about the Iron Mountain trouble you told him you were the man that shot five times at Kels Nickell?" His answer was: "I told him decidedly that I did not see why anyone should connect me with the killing of Willie Nickell, when to a certainty, after the officers had made an investigation, they found I was not there; and they also investigated in connection with the shooting of Kels Nickell, and I was a hundred miles from there at that time, and had not been in the country for two or three weeks. That is what I told him." Question: "Did you not in Hynd's saloon, on August 14th, say that you were the man that shot Kels Nickell, shot at him five times, and explain to him in that conversation why your shots went wide of the mark?" Answer: "I had a conversation with him regarding that, not in Hynd's saloon. I think it was in Tom Heaney's saloon. We were down there talking for two or three hours that night, and Joe Lafors says: 'Tom, if you will throw in with me we can cinch that damned outfit out there.' That is about the substance of the statement he made to me on that occasion."

Again, later on in his cross-examination, he stated that he had talked over the shooting of Willie Nickell with Lafors previous to the January conversation, and that there was never any intimation at any previous conversation between them that he was connected with the killing, but that in the previous conversation Lafors desired him to assist him in convicting some other person. In answering a question as to whether he was interested in ferreting out murders as well as cattle thieves, he said: "That would

not come directly in my line of business. To make an explanation of that it would necessitate going into the origination of the trouble over which this boy was killed." He continued to say that the previous conversations related wholly to his throwing in with Lafors to charge the crime upon another. He placed the number of previous conversations at three, and stated that they occurred in Cheyenne, at or near some designated saloon. The first conversation he stated occurred a night or two before he appeared at the coroner's inquest; the second, on the second day of the Frontier celebration; and the third, on a night between Christmas and New Year's.

It appeared from the cross-examination of the defendant, and was a notorious fact in the community, that some time before—we believe, some years before—two men named Powell and Lewis, respectively, had been killed in the vicinity of this trouble. The defendant was asked in reference to his statement that the money paid him was for three men killed and one man shot at five times, if Powell, Lewis and Willie Nickell were not referred to as the dead men, and he replied that he thought they were enumerated. He was asked if the one man shot at five times was Kels Nickell. His answer was: "I think that is the way it was reckoned—was understood if it is not enumerated. I think that is the way it was understood, anyhow."

The witness Lafors was called in rebuttal, and interrogated by the prosecutor regarding the previous conversations between himself and the defendant. He was asked to state whether in any of them the subject was that the defendant should go in with him and furnish evidence to convict somebody in the country. The witness replied that he had never had such a conversation at any time. Upon similar questions being propounded, objections were interposed on the ground that it was not proper rebuttal, and not relevant to the examination in chief of the defendant. The objection was overruled, and the witness specifically

denied that a conversation of that character occurred. He admitted that there had been two distinct conversations previous to January 12, and upon being requested to state what the conversations were, he was permitted to do so, over objections. He related the conversations substantially as follows: That he met Horn August 14 in the Tivoli saloon, and the latter asked him if he had not been out to where Willie Nickell was shot, and what he found there; that he told Horn he did not find much of anything, as a rain had prevented him from trailing his horse well; that he then said to Horn that his sights must have moved or something wrong with his gun, and asked him how the old man came to get away; and that Horn said: "Don't you think so. It was early in the morning, and the sun was not shining on the sights of my gun, or else it would have been different. You ought to have seen him run and yell like a Comanche Indian." That another conversation occurred in Hynd's saloon about Frontier time. Horn asked him what had been found in the investigation of the killing of Willie Nickell before the coroner's jury. Lafors told him he did not know. Horn said that there was a man on the coroner's jury who, if he could see him, would tell him everything that had happened there. That they then talked about the sheep that was shot out there.

It is very earnestly argued that the admission of this evidence violates the rule forbidding proof of the commission of any other crime by the defendant; and that except proof of the crime charged, and the defendant's connection with it, it is not competent to blacken the character of the defendant on trial; and it is insisted that the sole force of the testimony thus elicited from Lafors was to show the participation of the defendant in another and distinct offense. Counsel urged that the history of these troubles was a matter of such public notoriety that this court should take into consideration the knowledge of its members of such matters; and that, in view of such fact, the evidence admitted was so clearly collateral as to un-

justly and illegally place before the jury in the most damaging manner evidence tending to show a depraved character on his part, and his connection with another crime.

It is further contended that the attempt of the defendant to give certain conversations with Lafors did not warrant the prosecution in not only denying them on rebuttal, but to state the whole thereof referring to a separate and distinct crime. And the additional proposition is suggested that the examination of Horn on this subject went beyond proper cross-examination, as relating to a collateral matter, and could not, for that reason, be contradicted.

This raises one of the most vital and serious questions in the case. There can hardly exist a doubt that the evidence under consideration was calculated to operate to the serious detriment of the defense by enhancing the probability of conviction. If, therefore, we were convinced that the testimony had been improperly admitted, it would be our duty without hesitation to order a vacation of the verdict. But, after the most careful investigation, both of the evidence and the law upon the subject, we are clearly of the opinion that the rules of evidence were not violated by the admission of the testimony. The difficulty is not so much in understanding the legal principles involved as in the application of those principles to the facts of the particular case.

It is an elementary and salutary rule that a party is not permitted to contradict a witness upon purely collateral and irrelevant matters brought out on cross-examination. Was the supposed connection of the defendant with the shooting of or at Kels Nickell a collateral matter and irrelevant to any issue in the case? The defendant repeatedly stated on both his direct and cross-examination that he had never killed anyone, nor contracted to kill anyone. Having admitted the accuracy of the conversation of January 12 between himself and Lafors, as related by the witnesses for the State, and that the reference in that conversation to one man shot at five times was to Kels Nickell,

.he testified in the most positive manner that his statements connecting him with the killing of Willie Nickell or any other person, and all his statements in that conversation tending to show his participation in the crime, were made jokingly and as part of a series of "tall yarns." He denied that he made any of the damaging admissions seriously or with an intention of telling the truth, and alleged that he was relating details about which he had no knowledge, and that his statements in that regard were falsehoods; and he further testified that the conversation emanated from previous conversations, the substance of which he assumed to state. The defendant also testified explaining his purpose in going into the section of the country in question, at the time, that he understood Nickell had moved a bunch of sheep into that country, and that he went there to see if the sheep had been trespassing on any ground belonging to his employers, and he also took a view of some ground there belonging to another cattle concern; that he wanted to satisfy himself about it; and that Nickell in a conversation previous to that time had told him that he would not bother their property. On his cross-examination he was closely interrogated concerning his employment, its purposes and duties; and in referring to his claim that Lafors in previous conversations had wished him to assist him in convicting some other individual, he was asked whether he was willing to ferret out murders as well as cattle stealing, to which he replied as already set forth. In his confession he stated in effect that the boy was killed as he started to run to the house to prevent him raising a commotion. There are other points in the evidence indicating in a general way that whatever motive existed for the killing of the deceased, so far as the defendant was concerned, it was related, in a measure at least, with a suspicion or ill will directed towards his father.

The reference to the shooting at Kels Nickell was a material fragment of the confession, tending to illuminate the transaction, uncover the motive and explain generally

the situation.  Hence, in view of the facts above referred
to and the ultimate connection of the shooting at the father
with defendant's inculpating admissions, and his explana-
tion of all his damaging statements as a joke, including
his reference to shooting at a man five times, it was com-
petent for the State on cross-examination to question him
respecting similar statements at other times, and upon his
denial of such statements to contradict him by the testi-
mony of the person to whom the statements were made.
Such an examination and contradictory testimony would
affect his credibility, both in relation to his having killed
anyone, and the purpose and character of his confession.
(People v. Casey, 72 N. Y., 393; State v. Wells, 54 Kan.,
161; People v. Dupounce (Mich.), 94 N. W., 388; State
v. Armstrong (Wash.), 69 Pac., 392; State v. Merriman
(S. C.), 12 So., 619; State v. Kent, 5 N. D., 516; People
v. Pershing (Cal.), 62 Pac., 742.)

The prosecution made no effort to introduce affirmative
evidence of the fact of the shooting of Kels Nickell, nor
to otherwise show defendant's knowledge thereof or par-
ticipation therein, except by his own admissions; and this
circumstance cropped out in the main confession as a part
of it, and as explanatory somewhat of his motives; and
came to the surface again on his cross-examination, and in
rebuttal for the purpose of contradicting his testimony.

It seems to us, therefore, that it was relevant upon an
important issue in the case, viz., whether his confession
was or was not genuine, and intended to seriously and truth-
fully connect himself with the homicide.  If material for
any purpose the evidence would not become inadmissible,
because it might also point to the defendant as the per-
petrator of an independent crime.

The general rule is not to be disputed, that proof of the
perpetration of a separate and distinct crime will not be
admitted for the purpose of aiding the conviction of a
defendant of the particular crime charged.  Ordinarily such
proof, even in respect to a like crime, will have no possible

legal bearing upon the guilt of an accused of the crime for which he is on trial. Its only effect, generally, would be to show a moral capacity or disposition of the prisoner to commit such a crime, and might lead the jury to believe him more likely to commit the crime in controversy. But that furnishes no foundation in law for such testimony. On the contrary, it ordinarily supplies the reason for its exclusion. Yet it is true that it occasionally happens that proof of the commission of another crime, or a connection therewith on the part of a defendant, will bear closely upon the issue in the case on trial. Chief Justice Parker in People v. Molineux, 168 N. Y., 264, 340, said: "It is often carelessly said that the people cannot upon trial upon an indictment prove facts showing that the defendant committed another crime, a statement which is incorrect without the addition of the qualification, unless the facts establishing the other crime also tend to establish the commission by defendant of the crime for which he is being tried."

Proof of participation in other crimes of a similar nature is only competent when it bears directly upon the question of guilt of the crime for which the accused is being tried. If it has a reasonable tendency to establish the guilt of the prisoner of the crime charged, other than by merely showing a capacity or disposition to commit such crimes, or to show that, having committed one crime, it is probable he might be guilty of the one charged against him, it may be admissible. Hence, there are a number of well defined exceptions to the general rule; and the chief difficulty in any case is to determine whether it comes within any of the exceptions. In People v. Sharp, 107 N. Y., 427, Mr. Justice Peckham remarked: "The general rule is that when a man is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that under ordinary circumstances proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded. But for the purpose of showing guilt of the offense for which the pris-

oner is on trial, as also for the purpose of showing the motive or intent with which an act claimed to be a crime was committed, evidence which is material upon such issues is admitted, although it may also tend to show, or even directly prove, the guilt of the accused of some other felony or misdemeanor." The learned judge proceeds to discuss the various exceptions to the rule, and in the course of his opinion further says: "Then there is another class of cases in which the facts show the commission of two crimes, and that the individual who committed the other crime also committed the one for which the prisoner is on trial. Evidence is then permitted to show that the person was the person who committed the other crime, because in so doing, under the circumstances, and from the connection of the prisoner with the other crime, the evidence of his guilt of the other crime is direct evidence of his guilt of the crime for which he is on trial."

And in the case of People v. Molineux, *supra,* the learned court in the main opinion summarizes the exceptions to the rule as follows: "Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, (5) the identity of the person charged with the commission of the crime on trial."

Upon the facts, this case is peculiar. It is evident that the chief point in issue was the identity of the defendant as the party who shot the deceased. He had admitted to a witness that he was the boy's assailant; but the genuine character of that admission was denied. He was shown to have been in the vicinity of the crime the day preceding its occurrence; but by his testimony he located himself at another place, a few miles distant, on the morning of the homicide. Intimately associated with the matter of identity was the question of motive. In his confession

it was stated by him that he thought the boy was killed to prevent his raising a commotion. The question would naturally arise, why should a commotion be raised or feared? ·

The difficulty of ascribing a motive for the crime was recognized by Lafors, when he stated to Horn in effect that he had not understood why the boy was killed; and Horn was asked if the boy was one of the victims named. In response to that inquiry, Horn proceeded to describe the circumstances, explaining somewhat the purpose or necessity of shooting the deceased. In view of the situation of the parties, the relationship between the deceased and Kels Nickell, the proximity of the two assaults as to time, and the similarity between them—both assaults having been made by shooting—and the other circumstances, some of which have been specially adverted to, it appears to us that it would have been competent for the State under proper offers to have shown that the defendant was the person who shot or shot at the father. Such proof would have tended to establish both the identity of the defendant as the party guilty of the crime charged and his motive in the commission of that crime. As above stated, however, such proof was not attempted beyond showing defendant's admissions, in conversations referred to by defendant himself as explanatory of the conversation of January 12. Defendant not only denied having made such admissions, but he denied being at the time where the shooting of the father occurred. There was no effort made, however, to contradict him as to the latter denial, by proof of any affirmative facts.

In People v. Seaman, 107 Mich., 348, a case of manslaughter, the defendant, a physician, was charged with having caused the death of a young woman as the result of an abortion. The testimony of witnesses to the effect that the defendant had performed similar operations upon other persons at the same place was held admissible. And the court said that proof of another offense may be ad-

mitted when it constitutes part of the *res gestae,* or to show motive, intent or guilty knowledge; and many cases are cited in the New York and Michigan cases above cited that illustrate the application of the rule permitting such evidence. In Pennsylvania, where the prisoner was charged with the murder of his wife by means of poison, evidence of the death of another woman was held admissible under an offer to prove that she died by poison administered to her by defendant, while she was residing at his house a few days before his wife's death; that the arsenic administered was of the same description as that found in the wife's stomach, and that the poison was administered to both women in pursuance of a design on his part to obtain their property. It was admitted to show motive and intent, and to rebut the theory that the death of the wife was the result of accident or suicide. (Goersen v. Com., 99 Pa. St., 388.) The objection that the evidence was improper in rebuttal is not tenable. (Chadbourn v. Franklin, 5 Gray, 312.) Part of it may have been admissible in chief, but that fact does not in every case determine adversely the competency of evidence offered in rebuttal. As said by Chief Justice Shaw in the case above cited, referring to the usual rule in the production of evidence, where the point was made that error had been committed in admitting certain evidence in rebuttal: "But the propriety of its application in each particular case depends so much upon the circumstances of each case, and the actual state of the proof at the time it is offered, that it must be left almost entirely to the judge conducting the trial to say whether it shall be permitted at that stage. It sometimes occurs that the evidence on re-examination would have been pertinent as original evidence, in part, and is in part strictly rebutting."

The cases illustrating the application of the rule as to proof of other crimes are numerous, but the necessary length of this opinion in other respects forbids specific reference to any others than those above cited.

8. Objection is raised to the ruling of the court permitting the witnesses Lafors and Snow to give their opinions respecting the manner of the defendant during the conversations of January 12. On rebuttal, the witnesses were respectively asked to state what defendant's manner was in which he answered and talked in making the confession. Lafors stated that his manner was perfectly sincere. Snow testified: "His manner was to me that he was sincere in everything he said; there was no joshing about it that I could see." The last named witness stated on direct examination that he saw the defendant before he went into the office, and after he came out; that he heard him, and his tone of voice, and the manner in which he talked. On cross-examination, the extent of his observation was inquired about, and his ability to judge of the manner of defendant tested. He admitted that during the conversation he did not see him. As stated in the fore part of this opinion, the witness was behind the door leading into an adjoining room, and there overheard the conversation, having located himself in that place for the purpose of hearing whatever might be said.

This testimony was properly admitted as coming within the rule allowing non-expert witnesses to state their opinions regarding the appearance and demeanor of another, which are incapable of adequate description by any other means. Such opinions are received on the ground of necessity, since from the nature of the fact sought to be elicited no better evidence is obtainable. (Gillett on Indirect and Coll. Ev., Sec. 213 *et seq.*; McKee v. Nelson, 4 Cow., 355; Clary's Administrators v. Clary, 2 Ired. L., 78; Reininghaus v. Merchants' L. Asso. (Ia.), 89 N. W., 1113; 12 Ency. L. (2d Ed.), 490; Mitchell v. State (Fla.), 31 So., 242; Russell v. State (Neb.), 92 N. W., 751; State v. Houston, 78 Ala., 576; Hardy v. Merrill, 56 N. H., 227; 22 Am. R., 441; Isherwood v. Jenkins Lumber Co. (Minn.), 92 N. W., 230; Shelby v. Clagett, 46 O. St., 549; 5 L. R. A., 606.)

A comprehensive discussion of this subject is to be found in Hardy v. Merrill, *supra*. The question before the New Hampshire court in that case was the admissibility of the opinions of non-expert witnesses concerning the sanity of a testator. But the various phases of the subject are considered, and many authorities reviewed. The court formulated a general rule as follows: "Opinions of witnesses derived from observation are admissible in evidence, where, from the nature of the subject under investigation, no better evidence can be obtained;" and the learned court stated that, "without reference to any recognized rule or principle, all concede the admissibility of the opinions of non-professional men upon a great variety of unscientific questions arising every day, and in every judicial inquiry. These are questions of identity, handwriting, quantity, value, weight, measure, time, distance, velocity, form, size, age, strength, heat, cold, sickness and health; questions also concerning various mental and moral aspects of humanity, such as disposition and temper, anger, fear, excitement, intoxication, veracity, general character and particular phases of character, and other conditions and things, both moral and physical, too numerous to mention;" and, further: "And so, also, in the investigation of mental and psychological conditions; because it is impossible to convey to the mind of another any adequate conception of the truth by a recital of visible and tangible appearances; because you cannot, from the nature of the case, describe emotions, sentiments and affections, which are really too plain to admit of concealment, but, at the same time, incapable of description; the opinion of the observer is admissible from the necessity of the case; and witnesses are permitted to say of a person: 'He seemed to be frightened;' 'he was greatly excited;' 'he was much confused;' 'he was agitated;' 'he was pleased;' 'he was angry.' All these emotions are expressed to the observer by appearances of the countenance, the eye, and the general manner and bearing of the individual; appearances

which are plainly enough recognized by a person of good judgment, but which he cannot otherwise communicate than by an expression of results in the shape of an·opinion." As a test of the admissibility of opinions, the following inquiry was suggested by that court: "Is the employment of such testimony, from the nature of the case and its circumstances, the only way, or the best practicable way, of discovering the truth?" In the case of Shelby v. Clagett, *supra,* the witness was allowed to state with·reference to a plaintiff suing for damages occasioned through physical injuries: "Her suffering was very·intense, and often seemed more than she could bear." And the court said: "To say that those about a sick or injured person shall not be permitted to give in evidence their opinion, based on observation, of the·condition or suffering of the patient, is to exclude from the jury the only efficient proof of those facts. The rule admitting such evidence is one of necessity."

In Mitchell v. State, *supra,* the questions objected to were: "What was Mitchell's manner at the time the above remarks were passed?" "What kind of humor did he seem to be in?" The court said: "Both questions sought to elicit the mental condition of the defendant as exhibited by his manner on the occasion inquired about—whether he was in an angry or friendly mood—and both fall within the rule that the physical or mental condition or appearance of a person, or his manner, habit or conduct, may be proved by the opinion of an ordinary witness, founded on observation."

In Clary v. Clary, *supra,* it was said by the Supreme Court of North Carolina: "And so in regard to questions respecting the *temper,* in which words have been spoken or acts done. Were they said or done kindly or rudely—in good humor or in anger—in jest or in earnest? What answer can be given to these inquiries, if the observer is not permitted to state his impression or belief? Must a *fac simile* be attempted, so as to bring before the jury the very tone, look, gestures and manner, and let them collect thereupon the disposition of the speaker or agent?"

The Supreme Court of New York in the early case of McKee v. Nelson, *supra,* held, in an action for breach of promise of marriage, that it. was competent for witnesses, as a result of their observation, to state whether or not the plaintiff was *sincerely* attached to defendant. The learned court, in sustaining the ruling of the trial judge admitting the testimony, said: "We think the judge's decision founded in good sense, and in the nature of things. We do not see how the various facts upon which an opinion of the plaintiff's attachment must be grounded are capable of specification, so as to leave it, like ordinary facts, as a matter of inference to the jury."

The Supreme Court of Iowa in a case above cited say that, under a rule of every-day application in trial courts, witnesses are permitted to testify that a person was pleased or excited, or spoke *earnestly* or *jestingly,* and many other matters of mixed fact and opinion. "The limitations of human language are such as to render these rules a necessity. Many mental and physical conditions manifest themselves with practical certainty to the eye and mind of the ordinary observer, who cannot describe in apt terms the facts upon which his conclusion is based, but it does not necessarily follow that the conclusion is inadmissible as evidence." (Reininghaus v. Merchants' Life Assn,, *supra.*)

Illustrations might be multiplied, but the foregoing are doubtless sufficient to show the reason and scope of the rule. We fail to perceive the logic of the argument that human judgment is incapable of measuring the sincerity of the words or conduct of an individual. It is necessary in human affairs that the qualities of the mind, sentiments, purposes and motives be determined from appearances and circumstances. In this respect sincerity is not different from any other mental condition. We are not disposed to think that any subtlety of definition was involved in the use of the word "sincere." Its only palpable effect was to impress upon the jury that the defendant acted and appeared as though he meant what he said.

Notwithstanding the infirmity of human judgment when it comes to determining mental and psychological conditions, the real motives and purposes of an individual, such determination is frequently required. The jury in the case at bar were confronted with such a question, which could be determined, outside of the defendant's own interpretation, only by a reference to his manner and appearance at the time his inculpatory statements were made. It is the result of common every-day experience that the manner of a person as indicative of his mental condition or purposes can be more adequately explained by opinions founded upon observation than in any other way. It would have been practically impossible for the witnesses to have reproduced the tone of voice, gesture and appearance of the defendant for the benefit of the jury. Under the rule based upon necessity, therefore, it was proper to receive in evidence the opinions of the witnesses. In the case of the witness Snow, the limited extent of his observation was brought to the attention of the jury on cross-examination. He had heard the conversation and had given it strict attention, and while he did not see his countenance at the time, that fact might influence the weight to be given his opinion, but did not render it inadmissible.

9. It is contended that error was committed in giving the following, as part of the twelfth instruction: "It is not necessary that other facts or circumstances surrounding such testimony as has been given on behalf of the State should be established beyond a reasonable doubt. Some of such facts or circumstances may be established by a preponderance of evidence or may not be established. It is not meant that it is incumbent upon the prosecution to establish every fact surrounding such testimony, as given, beyond a reasonable doubt."

It is essential to a proper understanding of the legal effect of the language above quoted to consider the entire instruction and the connection in which the portion complained of was used. The instruction was as follows:

"It is incumbent upon the prosecution to establish all the material allegations of the information beyond a reasonable doubt. The material allegations of the information as here used are as follows: (1) That Willie Nickell was killed by some criminal agency; (2) that he was killed within this county at or about the time stated; and (3) that the defendant had a criminal agency in that killing. If these allegations are established in your minds beyond a reasonable doubt, then the prosecution has established beyond a reasonable doubt all the material allegations of the information. It is not necessary that other facts or circumstances surrounding such testimony as has been given on behalf of the State should be established beyond a reasonable doubt. Some of such facts or circumstances may be established by a preponderance of evidence or may not be established. It is not meant that it is incumbent upon the prosecution to establish every fact surrounding such testimoney, as given, beyond a reasonable doubt. All that is incumbent on the prosecution is that all the facts and circumstances taken together should establish the defendant's guilt beyond a reasonable doubt. If you are satisfied beyond a reasonable doubt, from all the evidence in the case, of the defendant's guilt, you should find him guilty."

Mr. Bishop says that the rule for purely circumstantial evidence is that every essential fact, or, in other words, every individual circumstance necessarily entering into the proofs, must be fully established beyond a reasonable doubt; but that where direct evidence mingles with the circumstantial, the considerations for the jury are proportionally modified. (1 Bishop New Crim. Pro., 1076.)

It is not true that the prosecution is bound to establish beyond a reasonable doubt every minor circumstance given in proof as tending to establish the main or ultimate fact essential to conviction. If that were the law all that a defendant would be required to accomplish to secure an acquittal would be to throw a reasonable doubt by his proof upon the truth of some slight circumstance entering into

the evidence for the State, although if disregarded enough would remain to show guilt beyond a reasonable doubt. For example: The theory of the prosecution in this case was that the defendant rode into Laramie very soon after the killing of the deceased. Much testimony was adduced on both sides in relation to that matter. The defendant claimed that he did not go to Laramie until Saturday. And he testified that he was in the country until that day. Now, it would be absurd to say that a conviction depended upon the jury being satisfied beyond a reasonable doubt that the defendant's arrival in Laramie was on Thursday instead of Saturday.

It is not every circumstance entering into the proof that the law requires to be established beyond a reasonable doubt. The learned author above referred to states that every essential fact, or every individual circumstance *necessarily* entering into the proofs—that is, every fact or circumstance necessary to be shown in order to establish the charge. The instruction in question so informed the jury. They were instructed that the fact of the killing of the deceased within Laramie County at or about the time stated, and of the criminal agency of defendant in that killing must be established beyond a reasonable doubt; and that all the facts and circumstances taken together should show the guilt of defendant beyond a reasonable doubt.

The words objected to are not misleading, nor liable to be misunderstood, when considered in connection with the remainder of the instruction. The proposition might have been stated perhaps in briefer and clearer language, but we do not think that as expressed it was liable to misconception. It is evident that all that it was intended to say was that every circumstance offered in evidence tending to establish the ultimate facts or circumstances on which a conviction depended, need not be proven beyond a reasonable doubt.

A number of cases have been cited in support of the objection which condemned an instruction to the effect that it

was not required that each link in the chain of circumstances be proven beyond a reasonable doubt. Such an instruction has often failed to receive approval by appellate courts on account of the use of the metaphor of a "chain." Since a chain is no stronger than it weakest link, it is quite generally held erroneous to say, when the circumstances are likened to a chain, that it is unnecessary to prove each link in that chain beyond a reasonable doubt. The reason of those decisions is so obvious that further discussion is unnecessary in that connection. Many of the cases, however, disapproving of an instruction of that character concede the correctness of the principle that the burden does not rest upon the prosecution of establishing beyond a reasonable doubt every circumstance offered in evidence which tends to establish the ultimate circumstances or facts on which it relies for a conviction. We think the reason behind that principle is equally obvious. We do not see that the instruction in question goes beyond that. We are not convinced that the language objected to in connection with the remainder of the instruction is to be interpreted as stating that the jury may consider and base a verdict of guilty upon facts and circumstances not established. Every juror knows that unless a fact is established it is not a fact in the case. The instruction took out of the case practically such facts as were not established, and rendered it unnecessary for the State to prove each circumstance offered in evidence to show defendant's connection with the killing, while the jury were required to be convinced beyond a reasonable doubt of the essential or ultimate facts; and were permitted to return a verdict of guilty if all the facts and circumstances proven, taken together, should establish such guilt beyond a reasonable doubt. The instruction does not, in our judgment, furnish a ground for a reversal of the judgment.

10. The next objection is based upon the refusal of the court to give an instruction requested by the defendant, as follows:

"You are instructed as a matter of law that where a conviction of a criminal offense is sought upon circumstantial evidence alone, the State must not only show by a preponderance of evidence that the alleged facts are true, but they must be such facts and circumstances as are absolutely incompatible upon any reasonable hypothesis with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the accused."

This is not a case of purely circumstantial evidence, although the circumstances offered in evidence constitute an important element in the case. In the first place it is evident that by such proof it was sought to corroborate the statements made by defendant in his confession, and in the second place to fasten the crime upon him independent of the confession. It is clear, however, that a conviction did not depend entirely upon the circumstantial evidence alone, or the confession alone. They supplemented each other. In view of the explanation offered of the confession by the defendant, the circumstances tended to throw light upon it, and doubtless aided the jury somewhat in determining its truthfulness. Nevertheless, should the jury have accepted the defendant's explanation, the only basis for a conviction would have been the evidence tending circumstantially to connect the defendant with the crime. We are not prepared, therefore, to say that it was improper to instruct the jury with respect to the rules governing the force and effect of circumstantial evidence. Although it would seem that such an instruction, where there is direct evidence also, or a confession, should by apt words be made applicable to the particular case. In State v. Seymour, 94 Ia., 699, an instruction requested on the subject of circumstantial evidence was said to be faulty because it eliminated all the direct evidence in the case.

While the court refused the instruction above quoted, another was given, at request of defendant, stating that in cases of circumstantial evidence "the jury must not only

be satisfied beyond a reasonable doubt that all the circum-
stances proved are consistent with the defendant having
committed the act, but they must also be satisfied that the
facts are such as to be inconsistent with any other rational
conclusion than that the defendant is the guilty person.
If there is any one single fact proved to the satisfaction of
the jury by a preponderance of the evidence, which is in-
consistent with the defendant's guilt, this is sufficient to
raise a reasonable doubt, and the jury should acquit the
defendant."

The following instruction was also given at defendant's
request:

"To authorize a conviction upon circumstantial evidence
alone, the circumstances must not only all be in harmony
with the guilt of the accused, but they must be of such a
character that they cannot reasonably be true in the ordinary
nature of things and the defendant be innocent." And the
jury were still further instructed at defendant's request
that, "in order to be convinced beyond a reasonable doubt,
you must find, after consideration of all the evidence, that
you have an abiding conviction to a moral certainty of the
guilt of the defendant, and unless you are so convinced
beyond a reasonable doubt you will acquit him."

In view of these instructions, it is not perceived that
any injury to defendant could have possibly resulted from
the refusal complained of. But the instruction refused was
condemned in this jurisdiction in the case of Cornish v.
Territory, 3 Wyo., 96. Mr. Justice Parks said, in the
opinion in that case, that the words "must be absolutely
incompatible with the innocence of the accused" have been
correctly defined to imply that the proof of guilt must be
established beyond the possibility of a doubt; and a state-
ment of the principle by the New York Court of Appeals,
in Poole v. People, 80 N. Y., 646, was approved, viz.: "A
jury is never required to find that it was not possible for
another to have committed the crime before they can con-
vict a prisoner on trial, or, in other words, to find that it is

impossible for the prisoner to be innocent. Such a degree of certainty is rarely attainable in the administration of justice. It is sufficient that all the material circumstances point to guilt, and that they are inexplicable upon the theory of innocence. The guilt must be established beyond a reasonable, not beyond a possible, doubt."

In Illinois an instruction similar to the one refused was said to be "so broad and sweeping in its terms that, if it were given in every criminal case dependent upon circumstantial evidence, it would have a tendency to prevent, in many instances, the conviction of guilty parties," and the instruction was held properly refused. (Carlton v. People, 150 Ill., 181, 191.) In Missouri a charge was held sufficient which informed the jury that they must find the facts and circumstances tending to prove guilt to be not only consistent with each other and the guilt of the defendant, but that the proven facts must be inconsistent with any rational hypothesis consistent with his innocence. (State v. David, 131 Mo., 380.) In California the refusal of an instruction was upheld which required the hypothesis contended for by the prosecution to be established with *absolute* moral certainty. (People v. Davis, 64 Cal., 440.) And in Minnesota a request was held erroneous which stated that if any single fact proved was inconsistent with guilt, the defendant should be acquitted. (State v. Johnson, 37 Minn., 493.) And the court held that it was sufficient to charge the jury that to authorize a conviction the circumstances should not only be consistent with the prisoner's guilt, but they must be inconsistent with any other rational conclusion. Greenleaf states the rule as follows: "Where a criminal charge is to be proved by circumstantial evidence, the proof ought to be not only consistent with the prisoner's guilt, but inconsistent with any other rational conclusion." (1 Greenleaf Ev., Sec. 34. See also State v. Rover, 13 Nev., 24; Smith v. State (Ala.), 31 So., 806.)

11. It is urged that the verdict should be vacated by this court because of certain alleged remarks made by the

prosecuting attorney in his closing argument to the jury.
The error, if any, does not arise upon any ruling of the
court during the trial.   No objections were interposed to
the remarks at the time of their utterance, nor was the
court requested to interrupt counsel or caution him in the
matter.   The only ruling in relation to this question that
is before this court for consideration is the order overruling
the motion for new trial.   Improper remarks of counsel
for the State was urged as a ground for new trial, and
certain affidavits of the defendant's attorneys were at-
tached to the motion setting forth the making of the alleged
improper statements.   These affidavits were met by affida-
vits of the prosecuting attorney and the attorneys who as-
sisted him on the trial.   The order overruling the motion
for new trial recites, as a finding of the court, that "there
was no misconduct on the part of the prosecuting attorney
in his address to the jury, and no objection was made to
any impropriety or misconduct in the address of the pros-
ecuting attorney by counsel for the defendant at the time
said address was made, nor was the court asked to caution
the prosecuting attorney as to any impropriety or miscon-
duct in his address, nor to instruct the jury with relation
thereto; the court, however, finding that on the last day
of the trial and during recess taken before the prosecuting
attorney closed his argument, and after the bailiffs were
sworn and the jury was passing out of the jury box, one of
the counsel for the defendant stepped to the bench and,
speaking in a low voice, said: 'We desire to except to the
remark of the prosecuting attorney,' whereupon said coun-
sel for defendant was informed by the court to make his
objections from counsel's table, so that the attention of
the prosecutor could be called to it, and nothing further
was done, nor was any particular language of prosecutor
stated or objected to."

The following are the remarks objected to: "Gentle-
men of the jury, you do not have the ordinary man here
to ·deal with; you have the criminal, a man of criminal

mind and criminal instincts; an extraordinary man." "You need not fear imbruing your hands in the blood of the defendant; after you is the court, then the Supreme Court, and then the Governor." "The people are very much in earnest in this case; they have furnished the money necessary for the prosecution; the officers have done their duty, and now the people demand a verdict at your hands." "You do not wish to be placed in the position and suffer the regrets which a jury trying a case in this court at one time have suffered, where the nine who desired conviction yielded to the wishes of the three and acquitted the defendant, who shortly thereafter killed a whole family of six persons, some of which jurors you are undoubtedly acquainted with and have heard them express their regrets." These several remarks are alleged to have been made at different places in the closing address of the prosecuting attorney—that is to say, the remarks separately quoted were not made at the same time, nor in connection with each other.

In the affidavits filed in opposition to the motion for new trial, these remarks, so far as conceded to have been made, are explained. The language in respect to the kind of man the jury had to deal with, it is explained, was employed at the conclusion of the comments of the prosecutor upon the testimony given by the defendant, and with relation to his testimony before the coroner which was in evidence in the case, upon his appearance and demeanor while testifying, and the unreasonableness of his story, together with the fact of his contradiction on material matters by other credible testimony. The accuracy of the language imputed to him to the effect that the jury need not fear imbruing their hands in the blood of defendant, and that after them was the courts and then the Governor is denied. It is explained that any words of that character which were employed was in reply to the argument of defendant's counsel urging the jury to accept his version of the facts, and to reject the version of the other witnesses;

and that the argument of the prosecutor was in substance and effect that it was the duty of the jury to carefully, fairly and conscientiously scrutinize all the evidence; that the jury was an integral part of the machinery of justice under our system of jurisprudence; and that the various steps were illustrated required to be taken upon the discovery of a crime to bring the offender to justice; and that the point had been reached where the jury had to act; that the people wanted no one convicted who was not guilty; that the jury should do its duty by weighing carefully all the evidence; that the officers had done their duty, and when called upon to act, the trial court would do its duty; when called upon to act the Supreme Court would perform its duty, and the same as to the Governor; and that it was not for the jury to question what other officers and tribunals would do; that in this connection only was the language used such as intimated; and that it could not be construed into a statement or inference that, should the jury make a mistake, there existed opportunities for its correction. Further, it is explained that defendant's counsel had urged the jury not to imbrue their hands in the blood of the defendant, and the prosecutor argued that they had no concern with the penalty, as the law had declared that one guilty of murder in the first degree should suffer death.

It is admitted that the substance, but not the exact words, of the remark last above quoted was used, viz., in reference to another case. But the explanation was offered in the affidavit that it was used in reply to the argument of one of the counsel for defendant who had cited several cases of circumstantial evidence to show that little reliability could be placed upon such evidence; and that the prosecutor referred to the case as reported without, however, naming it; and that counsel distinctly stated at the time of such reference that the attention of the jury was called to it for the purpose of having them conscientiously consider all the evidence relating to the different facts in the case.

Although the duty is incumbent on the court to check improper remarks of counsel, and by appropriate instructions to the jury endeavor to remove any prejudicial effect thereof, the rule is maintained in many jurisdictions that to entitle such a matter as improper remarks of counsel to consideration in an appellate court the record must show that proper objection thereto was made at the time and overruled, and an exception taken. (2 Ency. Pl. & Pr., 754, and cases cited; Collins v. People (Ill.), 62 N. E., 902; Com. v. Weber (Pa.), 31 Atl., 480; Stepp v. Hatcher (Ky.), 67 S. W., 819; People v. Kramer, 117 Cal., 647. 49 Pac., 842; People v. Brittain (Cal.), 50 Pac., 664; State v. Stockman (Kan.), 58 Pac., 1006; R. R. Co. v. Kellog, 55 Neb., 748; Reed v. State (Neb.), 92 N. W., 321; State v. Sale (Ia.), 92 N. W., 680.)

In People v. Kramer, *supra*, it is said by the California court that "the proper way to correct such abuse of privilege on the part of either counsel is for his adversary to call it to the attention of the court, and have it stopped," and that: "While error arising from misconduct of an attorney, of the character complained of, may not always be avoided by such means, it is essential, in order to have it reviewed, that the act be at least called to the attention of the court below at the time, that that tribunal may have an opportunity to correct the abuse, and thus, if possible, avoid error and a mistrial."

The Supreme Court of Iowa, considering a similar objection, say: "No exceptions were taken to the prosecuting attorney's argument at the time, and the objection cannot be first made on motion for new trial, when, if it had been promptly made, the court might have restrained any undue zeal on the part of the prosecuting attorney, and thus have prevented the prejudice which is afterwards claimed to have resulted." (State v. Sale, *supra*.)

We find ourselves unable to accept the view of counsel, that the tendency of an objection at the time would have been to strengthen the force of the alleged misconduct.

That certainly is not the ordinary effect of such an objection, if well taken at least, where counsel and jury are properly cautioned by the court. If the objection be overruled, the party has his exception. Prejudice on account of improper arguments is much more likely to be overcome or prevented by timely calling the court's attention to the matter, whereupon the latter may require the offending counsel to discontinue the improper statements, and instruct the jury to disregard them. But we are convinced that the chance for mistrials ought not to be encouraged by a rule permitting counsel to remain silent in the presence of prejudicial misconduct of an adversary in argument, and afterward, should an adverse verdict be returned, obtain a new trial on that ground. We think it a salutary requirement as a condition to review in an appellate court of such an objection that it be presented first to the trial court at the time of the occurrence of the misconduct. Possibly a case might arise where the violation of the proprieties and the conduct of the court in relation thereto would appear to have been so flagrant and indefensible, and the want of a fair trial so manifest, that a departure from the rule in that case would be justified. This is not such a case. Nor do we consider the remarks of the prosecuting attorney complained of so clearly improper and prejudicial as to authorize this court to disturb the verdict on the ground of error in the refusal of the District Court to order a new trial for that reason.

In Bunce v. McMahon, 6 Wyo., 24, this court said on this subject that "much must be left to the judgment of the trial court," and that "the trial judge can better determine whether in any given case an undue prejudice has been actually produced by the language of counsel, if it goes beyond that which is legitimate." As an additional reason for the rule we have been led to approve, it may be said that the trial judge will ordinarily be more capable of fairly determining whether the language is illegitimate and prejudicial if his attention be called to it at the time.

In the case at bar the trial court has found that there was no misconduct on the part of the prosecuting attorney in his address to the jury. The learned court heard the entire argument on both sides, and was in better position, therefore, to judge whether the rules of legitimate argument had been violated. Although for the reason above given the question is not before us for consideration, we think it proper to say in a case of this importance that we would be unwilling to disturb the finding of the trial court on the facts shown by this record.

12. One of the grounds for new trial insisted upon in the court below was alleged irregularities in the proceedings of the jury preventing the defendant from having a fair trial, viz.: (1) Misconduct by third parties, in the presence of the jury, prejudicial to defendant; (2) undue influence exercised upon the jury by third parties; (3) undue pressure upon the jury by third parties.

In support of this ground, certain affidavits were exhibited in substance as follows: The head waitress of the hotel where the jury took their meals during the trial deposed that remarks were made by different people, during the trial and when the jury were in the dining room, to the effect that there would probably be a hung jury in the Horn case—that there were three men on the jury who were supposed to be particular friends of defendant who would not convict him, and that a man would be more apt to tell the truth when drunk than when sober; that said statements were made by persons sitting at a table adjoining the one occupied by the jury. Juror Payne deposed that he overheard similar remarks, and observed that he was pointed out as a friend of the defendant, which gave him the impression that people thought that he had been "bought or fixed." He further deposed that while the jury were deliberating on their verdict the argument was made in the jury room that if they made a mistake the trial court or the Supreme Court would grant defendant a new trial. A Denver newspaper reporter deposed to having heard re-

marks, similar to those referred to made at the hotel while the jury were there.

The prosecution filed opposing affidavits. Juror Tolson deposed that in the dining room he sat opposite Juror Payne and nearer to the other guests in the hotel than said Payne, and that the affiant, although paying strict attention to what occurred at the table occupied by the jurors, did not hear any such conversation as related in the affidavits filed by the defense; that after the jury had retired six ballots were taken before a verdict was arrived at; that after the fifth ballot, which stood ten for murder in the first degree and two for acquittal—the two voting for acquittal being Jurors Thomas and Payne—affiant observed that it would be well to hear a statement from the two jurors before taking another ballot; and thereupon he asked said jurors if they voted for acquittal on the ground that Horn's conversation with Lafors was not in earnest, to which Juror Payne replied in substance that he did; that the entire evidence of Horn, together with the surrounding circumstances, was then discussed, at the conclusion of which Payne and Thomas consulted together, and then Thomas proposed another ballot, which was taken, resulting in twelve votes for murder in the first degree. He further deposed that Payne made no mention in his presence or hearing of his having overheard any remarks of third persons at the hotel or any other place. Juror Barnes deposed to an affidavit to the same effect. Bailiffs Reese and Proctor, who attended the jury during the trial, deposed that they were respectively especially cautious to see that no communication was had with the jury; that one of them sat at one end of the jurors' table and the other sat at the other end, and they heard no remarks of the kind mentioned by Juror Payne. The same newspaper reporter, whose affidavit has been referred to as filed by the defense, made another affidavit, stating that, after the trial was ended and a verdict had been returned, he had a conversation with Juror Payne, who said: "It was hard to go

against a man I have known and liked. But what could I do? The question was too hard to be dodged. I did my duty." George S. Walker deposed to a conversation with the same juror, wherein the latter said in substance that he had known Horn a long time and felt sorry for him, but he thought he was guilty and he had to do it.

There were other affidavits filed describing the situation of the dining room, and office or rotunda of the hotel, and showing that a large number of people boarded at the hotel during the trial.

The trial court expressly found in relation to this matter that there was no irregularity of the jury by which the defendant was prevented from having a fair trial; and that the defendant was not prejudiced in any of his substantial rights by reason of the remarks said to have been heard by Juror Payne.

We conceive it unnecessary to enter upon any extended discussion as to what facts of the nature disclosed by the affidavits alluded to will be sufficient to impeach a verdict and require its vacation. Upon a careful consideration of the affidavits filed on both sides, the District Court failed to find any prejudicial irregularity. It is evident to our minds that such a condition of affairs is not set forth as to justify our interference with the finding of the court in that respect. It is not clear to us that there is any reasonable ground to presume that the verdict was influenced by the remarks said to have been made by others. Indeed, but one affiant other than Juror Payne states that it was possible for the jury to have overheard them, and the jurors Tolson and Barnes, as well as the two bailiffs, assert that they did not hear them, although they were seated where they ought to have heard them if spoken loud enough to reach the ears of the jury. It is not rendered manifest that the verdict of Juror Payne was caused by such remarks. We perceive no good reason for holding that the learned judge who presided over the trial showed a lack of judgment or sound discretion in refusing a new trial on

this ground. In view of the finding of the trial court, we are unable to say that the verdict was affected by misconduct of third persons, or was brought about through undue influence or pressure from the outside.

The several objections urged have now been considered. The case is not only important in view of the character of the crime, and the penalty imposed upon it by law, but because of the unusual and peculiar features presented by the facts, and the legal propositions involved in its determination. A case of this kind always demands the most patient, studious and impartial consideration; and we think that this court has never underrated the responsibility resting upon an appellate tribunal of last resort, especially where the life or liberty of a citizen is in question. In the case at bar, in view of the earnestness of counsel both in relation to the facts and the law, and their apparent feeling that the verdict was to some extent influenced by public clamor, we have endeavored, by a close scrutiny of the record, to ascertain whether there was disclosed anything to reasonably indicate that the accused had not been afforded a fair and impartial trial. The objections to the rulings of the court have received our most careful consideration; a very large number of authorities have been consulted, in addition to those cited in this opinion; and it has all resulted in convincing our minds that the record furnishes no justification for a reversal of the case. It seems to have been ably and dispassionately tried. We are, therefore, of the opinion that the judgment should be and the same will be affirmed.

And now this court appoints Friday, the 20th day of November, in the year of our Lord 1903, for the execution of the sentence pronounced by the court below. *Affirmed.*

CORN, C. J., and KNIGHT, J., concur.